**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

**TYHEEM KEESH, f/k/a Tyheem Allah and**
**JESUS MICHAEL JOVA, f/k/a Robert D'Lucca,**

<table>
<tr><td></td><td style="text-align:center">**Plaintiffs,**</td><td>**9:04-CV-0779**</td></tr>
<tr><td></td><td></td><td>**(NAM)(GJD)**</td></tr>
<tr><td>**v.**</td><td></td><td></td></tr>
</table>

**JOSEPH T. SMITH, Superintendent, Shawangunk**
**Correctional Facility; EVAN GORELICK, Deputy**
**Superintendent of Programs, Shawangunk Correctional**
**Facility; GLENN S. GOORD, Commissioner, New York**
**State Dept. of Correctional Services; JOHN H. NUTTALL;**
**MARK LEONARD; GEORGE PATAKI,**

**Defendants.**

**APPEARANCES:**                    **OF COUNSEL:**

**TYHEEM KEESH,**
  **f/k/a Tyheem Allah**
**JESUS MICHAEL JOVA**
  **f/k/a Robert D'Lucca**
Plaintiffs, *pro se*

**OFFICE OF THE ATTORNEY GENERAL**    **JEFFREY P. MANS, Esq.**
**State of New York**                **Assistant Attorney General**
Counsel for Defendants

**Hon. Norman A. Mordue, D.J.:**

**MEMORANDUM-DECISION and ORDER**

**INTRODUCTION**

Plaintiffs Tyheem Keesh, f/k/a Tyheem Allah, and Jesus Michael Jova, f/k/a Robert

D'Lucca, inmates in the custody of the New York State Department of Correctional Services

("DOCS"), filed this civil rights action alleging that they have been denied accommodations by

DOCS to practice their religion in violation of their free exercise rights under the First

Amendment and the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc *et seq*. ("RLUIPA"). Dkt. No. 26. Plaintiffs' religion, known as "Tulukeesh" "the religion of the creator," was founded by plaintiff Keesh in 2003. Dkt. No. 31, Affirmation of Tyheem Keesh ¶ 9.[1]

Presently before the Court are motions from plaintiffs seeking preliminary injunctive relief. Dkt. Nos. 31, 36, 37.[2] By these motions, plaintiffs seek to compel the defendants to accommodate the plaintiffs' practice of their religion with respect to, *inter alia*, religious diet, holiday observances, programming, and access to religious items and literature. Plaintiffs also seek an order restraining the defendants from taking adverse actions against plaintiffs in retaliation for their exercise of their First Amendment rights. *Id.*

## FACTUAL BACKGROUND

By letter dated October 14, 2003, plaintiff Keesh advised defendants Goord and Smith of his desire to practice the religion of "Tulukeesh, the Religion of Zee Keesh (The Creator), of which the adherents are referred to as Keesh [and] to list [his] Religion as an authorized Religion within DOCS." Dkt. No. 26 (Amended Complaint) at Facts ¶¶ 1-2 and Ex. 1.[3] Plaintiff Keesh

---

[1] Keesh is also the plaintiff in an action commenced in 2002 in which he claimed, *inter alia*, that the had been denied the right to practice his Jewish faith. *Allah v. Walker*, 9:02-CV-0175 (FJS/DRH). Chief District Judge Frederick J. Scullin, Jr. granted summary judgment in favor of the defendants on this claim, finding that plaintiff failed to establish that his beliefs were sincerely held. *Id*., Dkt. No. 89. Keesh's appeal of the dismissal of this action is pending before the Second Circuit. Keesh states that he has filed other actions in federal and state court asserting free exercise claims. Dkt. No. 26 (Amended Complaint) Previous Lawsuits ¶¶ 1-8.

[2] Plaintiffs have filed other motions which are before Magistrate Judge Gustave J. DiBianco for decision. Dkt. Nos. 56 (motion for leave to file amended complaint), 66 (motion to compel discovery), and 74 (motion to compel discovery).

[3] Keesh and Jova had previously designated their religion as that of the Nation of Islam. Dkt. No. 47, Affirmation of Jeffrey P. Mans, Esq. ¶ 4.

identifies himself as the "Savior and Teacher" of Tulukeesh. *Id.* at Ex. A p. 3. Keesh's request letter set forth in detail the tenets and practices of Tulukeesh, which are also set forth in the book entitled "Holy Blackness," which Keesh authored. Dkt. No. 26 at Facts ¶ 12; Dkt. No. 36 (Motion for Preliminary Injunction) Affirmation of Tyheem Keesh ¶ 13.[4] Required practices and observances include adherence to dietary laws[5], observation of holy days and fast days[6], possession of religious items and literature[7], and adherence to mandates regarding hygiene[8] and health.[9] The practice of Tulukeesh requires congregational gatherings. Dkt. No. 26 at Facts ¶ 36.

By memorandum dated October 17, 2003, defendant Superintendent Smith acknowledged receipt of Keesh's letter request and advised him that further review by the Coordinating Chaplain was required. Dkt. No. 47, Mans Aff., Ex. F. Keesh was advised that in the interim he could practice his fundamental beliefs in the privacy of his cell, within the parameters of facility operating procedures. *Id.*

On October 28, 2003, defendant Gorelick, Deputy Superintendent of Programs at

---

[4] Defendants have submitted a copy of "Holy Blackness" to the Court for in camera review in connection with this motion. Dkt. No. 47 Ex. G.

[5] Tulukeesh adherents are directed to eat a vegan diet prepared by Tulukeesh followers. Dkt. No. 26 , Ex. 1 p. 2.

[6] Holy days include the birthdays of Keesh, Dr. Martin Luther King, Bob Marley and "Queen Mother Judy Keesh." *Id.* at Ex. 1 p. 3. In addition to monthly fast days, the assassination dates of several individuals are also fast days. *Id.* at Ex. 1 p. 4.

[7] These include a prayer rug and mat, head crown, flag, as well as a library of not less than 70 books and access to a radio and cassette player. *Id.* at Ex. 1 p. 5.

[8] Daily showers lasting seven minutes are required. *Id.*

[9] Professional training in the marital arts is required, including sparring. Adherents are not permitted to participate in any of the ART, ASAT, RSAT, or similar DOCS programs. *Id.* at Ex. 1 pp. 5-6.

Shawangunk, advised Keesh that, in accordance with DOCS Directive 4202, approval of all requests for congregate religious services or classes require the involvement of outside religious clergy and an approved inmate facilitator.  Dkt. No. 47, Mans Aff. Ex. F.  Gorelick also stated that special menus and holidays could be established only with direction from outside clergy.  *Id*.  Keesh was again advised that DOCS takes no position acknowledging any particular religion and that he could continue to practice his faith in his cell.  *Id*.

In June, 2004, Keesh commenced a proceeding in New York State Supreme Court pursuant to CPLR Art. 78, alleging that the determinations made by defendants Goord and Smith regarding the practice of Tulukeesh deprived him of his constitutional right to practice his religion.  Dkt. No. 47, Mans Aff. ¶ 5 and Ex. D.  By Decision and Judgment dated December 30, 2004, Keesh's petition was dismissed on its merits.  In his decision, State Supreme Court Justice E. Michael Kavanagh determined that the respondents acted reasonably and appropriately in responding to Keesh's request for accommodation of his religious beliefs and practices, by applying the provisions of DOCS Directive 4202.  *Id*. and Ex. E.

Plaintiffs have been disciplined for violations of prison rules and regulations in connection with their efforts to practice and promote their religious beliefs; they have been subjected to cell searches; and their religious papers and materials have been seized by prison authorities.  Dkt. No. 26.  In January, 2005, defendant Nuttall advised Keesh that publication of the Tulukeesh holy book without the Superintendent's permission violated facility rules, and that officials had determined that "unfettered access to the book by you having it in your cell and among the prison population, would pose the risk that you might gain undue influence over other inmates...and the danger that you might proselytize your views to others in the inmate population, causing serious

4

security problems in the facility." Dkt. No. 26 Ex. 75.[10]  Nuttall further advised that in order to reach "a reasonable compromise" balancing Keesh's interests in practicing his faith and the administrations' concern for the safety and security of staff and inmates, the Tulukeesh holy book would remain in the possession of the facility Chaplain, and that Keesh would be afforded periodic access to the book.  *Id.*  On February 23, 2005, Superintendent Smith advised plaintiff Jova that he was not entitled to possess the Tulukeesh holy book in his cell and that he would have access to the book "periodically, and on a reasonable basis."  Dkt. No. 26 at Ex. 77.

## DISCUSSION

**Preliminary Injunction Standard**

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter."  *Patton v. Dole*, 806 F.2d 24, 28 (2d Cir. 1986).  In most cases, the party seeking the injunction must show a threat of irreparable injury if the injunction is not granted and either (1) a probability of success on the merits or (2) sufficiently serious questions going to the merits of the claims to make them a fair ground of litigation, and a balance of hardships tipping decidedly in favor of the moving party.  *See Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996) (internal quotes omitted).  Where, however, a movant seeks relief which will alter, rather than maintain, the status quo, or which will provide him with substantially all the relief sought, the injunction sought is properly characterized as mandatory rather than prohibitory.  A party seeking a mandatory injunction must make a "clear" or "substantial" showing of the likelihood of success, as well as irreparable harm should the injunction not be granted.  *See id.* at 473-74.  The Court treats the instant motions as seeking mandatory rather than prohibitory relief; accordingly,

---

[10]  Although Nuttall's letter bears the date January 7, 2004, it clearly appears that the correct date was January 7, 2005, as the letter followed a memo from defendant Gorelick dated December 2, 2004 regarding the holy book.  *Id.* at Ex. 71.

5

plaintiffs must make a clear or substantial showing of the likelihood of success.

**Irreparable Harm**

"The showing of irreparable harm is the 'single most important prerequisite for the issuance of a preliminary injunction.'"  *Brown v. Middaugh*, 1998 WL 566791, *1 (N.D.N.Y. Sept. 3, 1998) (Munson, D.J.) (citations omitted).  Although "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976), irreparable harm has not been consistently presumed in cases involving allegations of the abridgement of First Amendment rights.  *See Amendola v. Town of Babylon*, 251 F.3d 339, 343 (2d Cir. 2001) (per curiam).

In *The Bronx Household of Faith v. Board of Education of the City of New York*, 331 F.3d 342, 349 (2d Cir. 2003), the United States Court of Appeals for the Second Circuit provided important guidance on this issue, and ruled that "[w]here a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed."  In that case, where the alleged deprivation of the plaintiff's First Amendment rights resulted directly from the defendant's policy prohibiting religious services or instruction in school facilities, the Second Circuit held that irreparable harm may be presumed.  *Id*. at 350.[11]

Based upon the foregoing, because plaintiffs allege that the deprivation of their First Amendment rights to free exercise of religion resulted directly from the denial of their request for religious accomodation based upon DOCS Directive 4202, irreparable harm may be presumed for the purposes of these motions.

**Likelihood of Success on the Merits – Generally**

---

[11]  The Second Circuit further stated that a plaintiff must establish a causal link between the injunction sought and the injury alleged where the injury results from a rule or regulation that may only potentially affect speech.  *Id*. at 350.

Plaintiffs must also demonstrate a likelihood of success on the merits of their claims that they have been improperly denied accommodation for their religious practices and observances in violation of the First Amendment. As noted, because plaintiffs primarily seek mandatory rather than prohibitory relief, they must make a clear or substantial showing on this issue.

It is well established in this Circuit that a court's scrutiny of whether a plaintiff is entitled to free exercise protection "extends only to whether a claimant sincerely holds a particular belief and whether the belief is religious in nature." *Jolly*, 76 F.3d at 476. Sincerity analysis "seeks to determine an adherent's good faith in the expression of his religious belief." *Patrick v. Lefevre*, 745 F.2d 153, 157 (2d Cir. 1984) (citing *International Society for Krishna Consciousness v. Barber*, 650 F.2d 430, 441 (2d Cir. 1981)). The *Patrick* court observed:

> This test provides a rational means of differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud. The latter variety, of course, must be subject to governmental invasion, lest our society abjure from distinguishing between the incantation of "sincerely held religious beliefs" as a talisman for self-indulgence or material gain and those beliefs genuinely dictated by conscience.

*Id.* Such an analysis requires the factfinder to "delve into the claimant's most veiled motivations[.]" *Id.*; *accord Ford v. McGinnis*, 352 F.3d 582, 588-91 (2d Cir. 2003).

In evaluating whether an adherent's belief is religious in nature, courts have rejected an objective, content-based approach in favor of "a more subjective definition of religion, which examines an individual's inward attitudes towards a particular belief system." *Id.* The Second Circuit has quoted with approval the definition of religion articulated by the American philosopher William James: "the feelings, acts, and experiences of individual men in their solitude, so far as they apprehend themselves to stand in relation to whatever they may consider the divine." *Patrick*, 745 F.2d at 158 (quoting W. James, The Varieties of Religious Experiences

31 (1910)).  Determining whether a sincerely held belief is religious in nature requires the factfinder to delve into the internal operations of the claimant's mind.  *Id.*

Even where an inmate holds a sincere belief that is religious in nature, his rights to free exercise of that religious belief are subject to restriction in the prison environment.  "Balanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, are the interests of prison officials charged with complex duties arising from administration of the penal system."  *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003), quoting *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990).  The Supreme Court has accorded great deference to the determinations of prison officials and fashioned "a lesser standard of scrutiny ... in determining the constitutionality of the prison rules."  *Turner v. Safley*, 482 U.S. 78, 81 (1987); see also *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987).  The standard is one of reasonableness, taking into account whether the particular regulation affecting some constitutional right asserted by a prisoner is "reasonably related to legitimate penological interests."  *Turner*, 482 U.S. at 89; *Shabazz*, 482 U.S. at 349; *Benjamin*, 905 F.2d at 574.  In *Turner*, the Supreme Court articulated four factors to be considered in determining whether a prison regulation is reasonably related to a legitimate penological interest: (1) whether there is a rational connection between the regulation and the penological interest asserted; (2) whether there are alternative means of exercising the right; (3) the impact that any accommodation of the right will have on guards, other inmates and prison resources in general; and (4) whether alternative methods for accommodating the right exist at *de minimis* cost to the penological interest asserted. *Turner*, 482 U.S. at 89-91.  Moreover, once a legitimate penological interest has been put forward to justify an infringement upon a prisoner's religious free exercise, the prisoner bears the burden of showing that these concerns "were irrational."  *Fromer v. Scully*, 874 F.2d 69, 74 (2d Cir.

8

1989) (upholding prison regulation requiring that prisoners' beards be no longer than one inch in order to preclude weapons or contraband from being hidden therein).

Plaintiffs' assertions that the defendants' determinations violate section 3 of RLUIPA also require the consideration of several factors.  Section 3 provides in relevant part that no government "shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution" unless the burden furthers "a compelling governmental interest" and does so by "the least restrictive means."  42 U.S.C. § 2000cc-1(a) (1)-(2).  In *Cutter v. Wilkinson*, __U.S. __, 125 S.Ct. 2113, 2122 (2005), the United States Supreme Court upheld the constitutionality of RLUIPA'S "institutionalized persons provision" and remanded the case for consideration of plaintiffs' particularized requests for religious accommodation.  In so ruling, the Court confirmed that "prison security is a compelling state interest," and stated that "[w]e do not read [RLUIPA] to elevate accommodation of religious observances over an institution's need to maintain order and safety.  Our decisions indicate that an accommodation must be measured so that it does not override other significant interests."  *Id.*, 125 S. Ct. at 2112, 2122-24 & n. 3.

**Likelihood of Success on the Merits – Sincerely-held Religious Belief**

In considering plaintiffs' likelihood of success on the merits, the Court considers first the plaintiffs' showing of a sincerely-held particular belief that is religious in nature.  Given the highly subjective and abstract nature of the inquiry, it is impossible to predict the outcome of a fact-finding hearing on the issue.  However, a thorough reading of the record, particularly Keesh's writings, provides substantial support for the view that plaintiffs are principally motivated not by religious impulses but rather by the desire to achieve a more congenial lifestyle during their incarceration.  For this reason, this Court finds that plaintiffs have not demonstrated a likelihood that a fact-finder would conclude that they are espousing sincerely-held religious

beliefs that are entitled to free exercise protection.

**Likelihood of Success on the Merits – Legitimate Penological Interests**

In addressing plaintiffs' likelihood of success on the merits, the Court turns to consider whether the burdens placed by DOCS on plaintiffs' asserted rights are reasonably related to legitimate penological interests. DOCS' policy regarding the accommodation of religious beliefs and practices, as set forth in Directive 4202, is discussed at length in the affidavit of defendant Mark Leonard, Director of Ministerial and Family Services. Dkt. No. 47. Leonard states that prison officials work diligently to accommodate inmates' religious beliefs within the confines of the overriding mandate to insure the safety and security of the staff and inmates at every facility.

According to Leonard, the practices and observances of a particular religious group will be accommodated by DOCS if the religion has a body of dogma, a religious leader outside the prison, and some tradition indicating that the religion has roots and a bona fide structure outside of prison. Leonard Aff. ¶ 6.[12] The religious practices that are accommodated for identified religious groups include arranging regular services and holiday services conducted by an approved religious leader, meeting special dietary needs, allowing religious symbols and materials, and providing a place for group worship. *Id*. ¶ 5.

Further, DOCS recognizes that an inmate may have sincere religious beliefs without being a member of an identified religion, and that some inmates may practice a particular religion in their own ways. In order to accommodate these individualized beliefs, DOCS permits inmates to pray and study in their cells and to receive religious guidance from prison chaplains. *Id*. ¶ 32.

---

[12] Leonard states that DOCS has identified and accommodated the following religions: Catholic, Protestant, Jewish, Muslim, Rastafarian, Native American, and Santeria. *Id*. ¶¶ 2-3. In the past, the religions of Odinism and Moorish Science Temple were sanctioned for group activities. *Id*. ¶ 8.

Inmates are also allowed to receive the Religious Alternative Menu[13], to fast in accordance with their religious beliefs, and to purchase food to conform to their religious needs. *Id*. ¶¶ 35-36. Inmates are permitted to receive religious publications, provided, however, that they may not receive material that will incite violence or threaten prison security. *Id*. ¶ 33. DOCS Directive 4202 specifically provides that "[u]nder no circumstances will proselytizing be permitted on the part of staff, volunteers or inmates." Dkt. No. 47 Mans Aff. Ex. H.

Leonard points out that any requirement that the individualized religious beliefs of the approximately 64,000 inmates in New York state prisons be accommodated beyond a certain point would impose an enormous undue administrative burden. In addition to the monetary cost, the potential for disruption caused by providing inmates with individualized schedules, privileges, and diets, and the legitimate security concerns which accompany all inmate movement and gatherings are significant. As Leonard notes, many religious practices provide inmates with privileges that they would have no other way of securing and which are particularly important in a prison setting. Leonard Aff. ¶¶ 43-44. Leonard adds that every prison privilege carries with it the opportunity for abuse and manipulation, which may entail serious security risks for guards and other inmates. Indeed, he states, religious affiliations have in the past been used to smuggle contraband, conceal weapons and promote gang activity. *Id.* ¶¶ 59-68.

Leonard concludes:

> In sum, due to the foregoing concerns, DOCS assumes each inmate's individualized beliefs are sincere and then accommodates individuals who want to practice a group religion in their own unique way or who claim to practice a religion that has no body of dogma and/or outside religious leader and tradition through a uniform set of privileges.

---

[13] This is described as a diet program developed by DOCS "to accommodate the religious meal requirements of various religious groups, including not to eat red meat or pork and to those with common fish allergies." *Id*. ¶ 35.

11

> Although DOCS cannot accommodate every individualized belief, DOCS provides a uniform set of guidelines that enables all inmates to receive religious counseling and to satisfy many, if not most aspects of their individualized beliefs.

*Id.* ¶¶ 69-70.

Defendants further maintain that their application of DOCS Directive 4202 in this particular case is rationally related to legitimate penological interests and satisfies *Turner* and RLUIPA.  Here, plaintiffs seek numerous holiday observances and opportunities for group worship, a special diet consisting of fresh organic foods prepared by Tulukeesh adherents and served to inmates in their cells[14], seven minute daily showers (instead of three showers per week) and the right to possess both a radio and a tape player (DOCS regulations permit inmates to possess only one audio device).  *See* Dkt. No. 47, Leonard Aff. ¶¶ 80, 82, 84.  Tulukeesh also holds that its faithful must train in the martial arts (contrary to DOCS Standard of Inmate Behavior) and be provided with a professional trainer; must not appear nude before "people who are not of us" (precluding staff from conducting strip frisks when necessary); and must refrain from participation in several DOCS programs (*e.g.* ART, ASAT, RSAT).  *See id.* ¶¶ 79, 80, 81. Certain passages in Holy Blackness may be read to encourage physical aggression and escalation of physical altercations.  Other portions refer to the justice and corrections systems as serving the "enemy."  Indeed, Tulukeesh adherents believe that they "are unlawfully incarcerated and should be returned to free society."  Dkt. No. 47 Mans Aff. Ex. A, p. 6.  Such tenets obviously carry with them the opportunity for abuse and manipulation, and in some cases may entail serious security risks for guards and other inmates.

Plaintiffs contend that security and administrative concerns articulated by DOCS to justify

---

[14] Adherents are required to eat certain foods on certain days of the week.  For example, on Saturdays they are required to eat brown rice, blackeye peas, sweet potatoes, collard greens, pumpkin seeds, broccoli, cabbage, oranges, carrots, blackberries and bananas.

the restraint of their free exercise of religion are unfounded and/or insignificant.  For example, plaintiffs maintain the Tulukeesh practice of having meals served to inmates in their cells rather than in the dining area actually enhances prison security by reducing inmate movement.  Dkt. No. 53 at ¶ 9.  Plaintiffs also claim that the "animal" diet is not only more expensive than the vegan diet eaten by Tulukeesh adherents, but it also increases violence within the prison.  *Id.* at ¶¶ 10, 11.  According to plaintiffs, because plaintiff Keesh is present at the facility, outside clergy is not necessary to provide guidance, instruction or direction regarding the teachings and practices of Tulukeesh.  *Id.*; Dkt. No. 53 ¶ 29.  Plaintiffs also contend that the prohibition against proselytizing is unreasonable because inmates can only learn about Tulukeesh in prison from other inmates.

The Court has carefully reviewed the extensive record on these motions.  Defendants have demonstrated the rationale behind their conduct by explaining the difficulties and risks entailed in acceding to plaintiffs' requests.  The Court finds that defendants have made a preliminary showing that their conduct towards plaintiffs is reasonably related to legitimate penological concerns and that it furthers, by the least restrictive means, the compelling governmental interest in maintaining institutional order and safety.  Plaintiffs have not shown that they are likely to succeed on the merits on this issue.

**Preliminary injunction – Mandatory**

The Court finds that plaintiffs have not made a clear or substantial showing that they are likely to succeed on the merits of their claims that the defendants' refusal to accommodate certain aspects of plaintiffs' religious observances is unconstitutional or that it violates RLUIPA.

**Preliminary Injunction – Prohibitory**

For the reasons set forth above, to the extent that the preliminary injunctive relief sought

by plaintiffs in these motions is prohibitory rather than mandatory, the Court finds that plaintiffs have not demonstrated a probability of success on the merits.  Moreover, particularly in view of DOCS's showing of legitimate penological concerns, plaintiffs have failed to demonstrate sufficiently serious questions going to the merits of the claims to make them a fair ground of litigation, and a balance of hardships tipping decidedly in their favor.

## CONCLUSION

Accordingly, plaintiffs have not established their entitlement to preliminary injunctive relief.

It is therefore

ORDERED, that plaintiffs' motions for preliminary injunctive relief (Dkt. Nos. 31, 36, 37) are denied, and it is further

ORDERED, that the Clerk of the Court return to defendants' counsel the Tulukeesh holy book and other materials (Dkt. No. 47, Mans Aff. Exs. G, J, K) which were submitted to the Court for *in camera* review in connection with plaintiffs' motions, and it is further

ORDERED, that the Clerk serve a copy of this Memorandum-Decision and Order on the parties.

IT IS SO ORDERED.

March 2, 2006
Syracuse, New York

Norman A. Mordue
U.S. District Judge