UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

**TYHEEM KEESH; JESUS JOVA,**

                                           **Plaintiffs,**

        **vs.**                                                    **9:04-CV-0779**
                                                                   **(NAM/GJD)**

**JOSEPH T. SMITH; EVAN GORELICK, et al.,**

                                           **Defendants.**
_____

TYHEEM KEESH
90-B-0548
Shawangunk Correctional Facility
P.O. Box 700
Wallkill, NY 12589
Plaintiff, *Pro Se*

JESUS JOVA
95-A-0425
Shawangunk Correctional Facility
P.O. Box 700
Wallkill, NY 12589
Plaintiff, *Pro Se*

JEFFREY P. MANS
Assistant Attorney General
The Capitol
Albany, New York 12224
Attorney for Defendants

**Hon. Norman A. Mordue, Chief U.S. District Judge**

### MEMORANDUM DECISION AND ORDER

        In this amended civil rights complaint, plaintiffs Tyheem Y. Keesh and Jesus Jova claim

that defendants have violated their First Amendment rights to freely practice their chosen religion

as well as their rights under the Religious Land Use and Institutionalized Persons Act (RLUIPA),

42 U.S.C. § 2000cc *et seq*. (Dkt. No. 26).  Plaintiffs also claim that defendants have violated the

plaintiffs' rights to Equal Protection and Due Process in connection with the right to practice their

chosen religion and have retaliated against plaintiffs for the exercise of their First Amendment

rights.[1]  Finally, plaintiffs allege that defendants' conduct violated various state regulations and

Department of Correctional Services (DOCS) Directives.[2]  Plaintiffs seek both injunctive and

substantial monetary relief.

Presently before the court are two dispositive motions.  Defendants have filed a motion for

summary judgment pursuant to FED. R. CIV. P. 56, (Dkt. No. 101).  Plaintiffs have opposed

defendants' motion (Dkt. No. 117) and have cross-moved for summary judgment, (Dkt. No. 112).

Defendants have opposed plaintiffs' cross-motion, (Dkt. No. 118), and plaintiffs' have filed a

reply. (Dkt. No. 119)  The record is filled with an enormous number of exhibits, including the

deposition transcripts of both plaintiffs.  On June 18, 2007, plaintiffs filed additional exhibits in

support of their motion. (Dkt. No. 125).  Many of the documents have been sealed from public

view. (Dkt. Nos. 102-11).

**DISCUSSION**

1.    <u>**Summary Judgment**</u>

Summary judgment may be granted when the moving party carries its burden of showing

the absence of a genuine issue of material fact.  FED. R. CIV. P. 56; *Thompson v. Gjivoje*, 896 F.2d

---

[1] The court would point out that although "retaliation" for the exercise of a constitutional right is not listed in the section entitled "Causes of Action" of the amended complaint, several of the paragraphs contained in the amended complaint allege retaliation. *See e.g.* Amended Complaint ¶¶ 53, 63, 64, 78, 84, 133, 158.  At plaintiff Keesh's deposition, he stated that a claim for retaliation "should have been included." Keesh Dep. at 265.  Plaintiff Jova also testified at his deposition that there were "many" acts of retaliation in this law suit. Jova Dep. at 119-21.  In the interests of liberality, this court will assume that plaintiffs are claiming that the were subjected to retaliation for the exercise of their First Amendment rights.

[2] It also appears that in plaintiffs' third cause of action, they are claiming that DOCS Directive No. 4202 "***would have to be deemed unconstitutional***" if it were used to deprive plaintiffs of their religious rights.

716, 720 (2d Cir. 1990) (citations omitted).  "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id*.  However, when the moving  party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).  At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id*.

In this case, both defendants and plaintiffs have moved for summary judgment.  Thus, both sides are arguing that there are no questions of material fact and that they are entitled to judgment as a matter of law.  Plaintiffs claim that they have shown that under the First Amendment as well as RLUIPA, they are entitled to practice their religion as they see fit, and defendants claim that they have shown that plaintiffs' individualized religious beliefs were properly accommodated under both the Constitution and RLUIPA.  Defendants also argue that collateral estoppel bars plaintiffs' religion claims, and that plaintiffs have failed to state a claim for retaliation.  Finally, defendants argue that the complaint fails to state a claim against former Governor George Pataki, and that defendants are entitled to qualified immunity.

2.     **Facts**[3]

On October 14, 2003, plaintiff Keesh wrote a letter to defendants Goord and Smith, advising them of his desire to practice the "Tulukeesh" religion. Amended Complaint (AC) at ¶ 1 and Ex. 1. (Dkt. No. 26).  Plaintiff Keesh's letter also sought to establish Tulukeesh as an

---

[3] Some of the relevant facts were stated in this court's March 2, 2006 denial of plaintiffs' motion for preliminary injunction. (Dkt. No. 79).  Many of the submissions in support of the defendants' opposition to the motion for injunctive relief are the same exhibits in support of the defendants' summary judgment motion.  The court will repeat the facts as necessary for clarity.

authorized religion within DOCS. *Id.* Ex. 1.  According to plaintiff Keesh, "Tulukeesh" is the "Religion of Zee Keesh (The Creator)," and plaintiff identifies himself as the "Savior and Teacher" of Tulukeesh. *Id.* Ex. 1 at pp.1, 3.  Plaintiff Keesh also states that he is the "Leader and Founder" of Tulukeesh. Mans Aff. Ex. 19, Keesh Aff. ¶ 3.[4]

The letter further outlined many of the required practices and observances of Tulukeesh. AC, Ex. 1.  These practices include adherence to dietary laws, observation of holy days and fast days, possession of religious items and literature, hygiene requirements, exercise, and health requirements. *Id.* at pp.1-6.  The dietary laws include eating a vegan diet, without soybeans, prepared only by another follower of Tulukeesh. *Id.* at pp.1-2.  Additionally, certain foods must be eaten on certain days of the week, and plaintiff Keesh carefully outlined in his letter which foods were to be eaten on which days. *Id.* at p.2.  The specified holy days include the birthdays of plaintiff Keesh; Dr. Martin Luther King; Bob Marley; and Judy Keesh (plaintiff's mother). *Id.* at p.3.  The religious items that each Keesh adherent must possess include a prayer rug and mat; head crown; flag; and a library of not less than seventy books. *Id.* at pp.4-5.  They are also required to have access to both a radio and a cassette player. *Id.* at pp.4-5.

Tulukeesh followers must have "professional" training[5] in the martial arts, must spar with a partner, and must have all the equipment associated with this activity. *Id.* at p.5.  Tulukeesh followers do not believe in taking any program offered by DOCS, because the Creator (plaintiff

_____

[4] The court notes that this case contains a great number of documents and a great number of duplicate documents due to the motions for injunctive relief that have preceded these motions for summary judgment as well as the two summary judgment motions themselves.  Defense counsel has attached many of these documents as exhibits to his affidavit in support of defendants' motion for summary judgment.  The court will not attempt to cite each location where a particular document is located since plaintiffs and defendants have attached many of the same documents to their papers.

[5] This includes a "trained professional" to instruct them. Ex. 1 at p.5.

Keesh) is "much stronger and Powerful than any program DOCS can offer . . . ." *Id.* at p.6.

Tulukeesh adherents believe that they are unlawfully incarcerated and should be returned to

society. *Id.*  They must maintain proper grooming and shower for at least seven minutes per day.

*Id.* at p.5.  Tulukeesh also requires congregate services and gatherings with other followers. AC at

Facts ¶ 12.  These are only some of the requirements of Tulukeesh that were included in the

October 14, 2003 letter.

Plaintiff Keesh has also authored the Holy Book of Tulukeesh, entitled the "Holy

Blackness." Defendants' Ex. G.  At his deposition, plaintiff Keesh stated that the Creator

inscribed the Holy Blackness into plaintiff Keesh's heart and that Keesh was the "tool" used to

put the book on paper. Defendants' Ex. L, Keesh Dep. at 55.  In one of plaintiff Keesh's

affidavits, he states that he has been receiving "revelations from ZEE KEESH (. . . "The Creator)"

since plaintiff Keesh was a child, and that Zee Keesh told plaintiff Keesh to practice and believe

"different religions in the early stages." Defendants' Ex. 19, Keesh Aff. ¶¶ 4, 7.

By memorandum dated October 17, 2003, defendant Superintendent Smith acknowledged

receipt of plaintiff Keesh's letter-request and told plaintiff that DOCS took no position in

acknowledging any religion within the inmate population, rather, DOCS supported "the concept

of religious liberty." AC, Ex.2.  Defendant Smith also pointed out that, at that time, plaintiff

Keesh's religion was listed in DOCS records as Nation of Islam (NOI), and that prior to further

action by DOCS, it would be helpful to have plaintiff Keesh's book reviewed by the Coordinating

Chaplain, Imam Rashid. *Id.*  In his memorandum, defendant Smith further stated that "your

beliefs are fundamental and you may practice them as best you can, in the privacy of your cell,

within the parameters established by current facility operational procedures." *Id.*

In a memorandum to defendant Smith, dated October 22, 2003, plaintiff explained that he

5

had met with the Chaplains, and that his only concern was that adherents of Tulukeesh be allowed to practice their religion. AC, Ex. 3 at p.1.  Plaintiff then explained that he was sincere in his beliefs, evidenced by the fact that he had given up many things to practice Tulukeesh, including many foods that he otherwise would have eaten. *Id.*  Plaintiff stated that the Creator forbade plaintiff from eating these foods, and that plaintiff no longer had a will of his own, his will was that of the Creator. *Id.*

In his October 22, 2003 memorandum, plaintiff mentioned his affiliation with NOI, stating that he identified with that religion and that NOI religious material had been given to him by his grandfather, who received the material from Elijah Muhammad. *Id.*  However, plaintiff did not accept the teachings of NOI's current leader, Louis Farrakahan. *Id.* at p.2.  Plaintiff referred to a prior lawsuit, brought in the Western District of New York in which plaintiff Keesh claimed that the defendants were depriving him of his right to practice the NOI religion.[6] *Id.*

On October 28, 2003, defendant Gorelick sent plaintiff Keesh a memorandum, stating that approval of all requests for congregate services or classes required the involvement of an "outside" member of the clergy, together with an approved inmate acting as a facilitator. *Id.* Ex.

---

[6] Plaintiff cites *Allah v. Kelly*, 99-CV-878 (CJS/CEH).  Plaintiff Keesh has also brought other actions in federal court.  He was the plaintiff in *Allah v. Walker*, 9:02-CV-175 (FJS/DRH), in which he claimed *inter alia* that he was denied the right to practice the Jewish religion and denied the right to receive "religiously appropriate food." *Allah v. Walker*, 9;02-CV-175 (N.D.N.Y. April 20, 2005).  In *Allah v. Walker*, Senior Judge Scullin granted defendants' motion  for summary judgment finding, in part, that plaintiff had not established the sincerity of his beliefs. *Id.* at 14-15.  The Second Circuit dismissed the appeal because it lacked "an arguable basis in fact or law." *Allah v. Walker*, No. 05-3053, slip op. (2d Cir. Nov. 30, 2005)(Dkt. No. 95 in 02-CV-175).
    Defendants have also cited to various other actions in which plaintiff Keesh alleged that defendants were violating his right to religious freedom as well as other constitutional claims. Mans Aff., Ex. L, Exs. 10-12.  In *Allah v. Kelly*, 96-CV-7323, 2000 U.S. Dist. LEXIS 7107 (W.D.N.Y. Jan. 27, 2000), plaintiff complained that the Religious Alternative Menu (RAM) was not sufficient for NOI followers.  United States District Judge Charles J. Siragusa granted summary judgment for defendants, finding that plaintiff had not demonstrated either that his ability to practice his religion had been "substantially burdened" or that the RAM diet did not survive scrutiny under *Turner v. Safely*, 482 U.S. 78 (1987) and *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987). *Id.*

6

4. Defendant Gorelick stated that until those requirements were met, "individual services" could be held in plaintiff Keesh's cell, but that approved menus and holidays would also have to be coordinated with outside clergy. *Id.*

On November 3, 2003, defendant Nuttal, the Deputy Commissioner for Program Services wrote plaintiff Keesh a letter, responding to Keesh on behalf of then-Governor Pataki and Commissioner Goord. *Id.* Ex. 6.  Defendant Nuttal reminded plaintiff that he was still registered as a member of the NOI, and that plaintiff was still participating in the religious activities of that group.  Defendant Nuttal told plaintiff that if he wished to change his religious registration, he would have to make that request through the Coordinating Chaplain. *Id.*  Plaintiff Keesh subsequently applied to change his religious affiliation, however, because DOCS did not formally recognize Tulukeesh, plaintiff's religion was changed to "other" in DOCS records. *Id.* Exs. 7, 8, 10.  This change appears to have taken place in mid-November of 2003. *Id.* Ex. 10.

Plaintiff Keesh filed various grievances regarding his religious requests as well as grievances complaining about alleged retaliation.  *See e.g.* AC, Exs. 13, 18, 62, 63, 64, 70, 73.  In a grievance, dated December 3, 2003, plaintiff Keesh again complained that he was not being allowed to practice his religion, and complained that he could not comply with DOCS Directive 4202 because there were no Tulukeesh clergy outside the facility. *Id.* Ex. 13 at p.1.  Plaintiff also complained that his religious affiliation had been changed to "other" and not "Tulukeesh." *Id.* Plaintiff stated that a copy of the Holy Blackness had been confiscated during a cell search and "copied" without his permission in violation of federal copyright laws. *Id.* at p.2.  The book was apparently returned to plaintiff. *Id.*  Finally, plaintiff claimed that defendant Gorelick was preventing plaintiff from participating in physical education in retaliation for his complaints because defendant Gorelick knew that participating in physical education was part of plaintiff's

religion. *Id.*

The Inmate Grievance Review Committee (IGRC) found that plaintiff should be able to practice his religion as outlined in Directive 4202. *Id.* at 3. At the Superintendent's appeal level,[7] on January 7, 2004, plaintiff was again advised that he could practice his beliefs in the privacy of his own cell, and that plaintiff's religious designation had been changed to "other" in accordance with DOCS policy.[8] Finally, plaintiff was told that he could participate in physical education "as long as he's not otherwise assigned." *Id.* at 4.

On March 17, 2004, the Central Office Review Committee (CORC), the final appeal level for grievances, upheld the Superintendent's determination. *Id.* at 5. Plaintiff was told that his documents had been returned to him, that he was welcome to encourage an outside "clergyperson" to contact the Coordinating Chaplain and apply to become a registered religious volunteer as stated in DOCS Directive No. 4202(C).[9] *Id.* Plaintiff was also told that he could choose the "religious alternative meal" (RAM). *Id.* Finally, plaintiff was told that he should

---

[7] The regular Inmate Grievance Program (IGP) consists of a three-tiered process. *Hemphill v. State of New York*, 380 F.3d 680, 682 (2d Cir. 2004). The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). *Id.* §§ 701.5(a)(1) and (b)(sections were renumbered in 2006). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id.* § 701.5(d). An inmate must appeal any denial of his grievance to the highest available administrative level. *Martinez v. Williams*, 349 F. Supp. 2d 677, 682 (S.D.N.Y. 2004). There is also an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 NYCRR § 701.8.

[8] Because Tulukeesh is not a formally recognized religion within DOCS, the designation "other" is used on the form designating an inmate's religious affiliation.

[9] On April 9, 2004, defendant Gorelick sent plaintiff a memorandum explaining how an outside member of the clergy could apply to be an approved "Community Spiritual Advisor." AC, Ex. 25.

8

address any concerns regarding his excessive weight loss to the medical department.[10] *Id.*

Plaintiff Keesh has attached many letters to this complaint, both that he has sent to prison officials and to other individuals as well as letters that plaintiff received in response to his complaints. *See e.g.* Exs. 14, 15, 26, 27, 28, 29, 30, 32, 33.  On December 29, 2003, plaintiff received a letter from Executive Deputy Commissioner, John R. Patterson, Jr. stating that a review of the matter revealed that facility staff had responded attentively to plaintiff Keesh's desire to practice Tulukeesh, "a religion that you founded, and one where you consider yourself to be its Savior." *Id.* Ex. 14.  In concluding that facility staff had acted reasonably and appropriately, Deputy Commissioner Patterson stated that facility staff had changed plaintiff's religious designation, had read his Holy Blackness book, and had allowed plaintiff to practice his religion in his cell. *Id.*

On December 30, 2003, defendant Nuttal wrote plaintiff a letter on behalf of defendants Pataki and Goord, stating, *inter alia*, that plaintiff's religious designation had been changed to "Tulukeesh"[11] and that plaintiff had been allowed to practice his faith.  *Id.* Ex. 15.  Plaintiff was told that the facility staff had verified that the Holy Blackness had been returned to plaintiff in good condition, however, if plaintiff believed that the book had been damaged, he could file a claim.

On January 9, 2004, Plaintiff Jova filed a grievance. *Id.* Ex. 18.  Plaintiff Jova basically complained in very similar language to plaintiff Keesh, that Jova was being denied the right to properly practice Tulukeesh. *Id.* Ex. 18.  Plaintiff Jova apparently did not receive a response to

---

[10] Plaintiff claimed that because his dietary requirements were not being met, he was losing weight, and his health was otherwise suffering. AC, Ex. 13.

[11] This statement is clearly in error since there is no designation within DOCS for "Tulukeesh", however, this error does not affect this court's analysis.

this grievance and thus, appealed to the Superintendent on January 19, 2004. *Id.* at p.2.  On February 2, 2004, plaintiff Jova wrote an appeal to the Commissioner, apparently because he had no answer to either his initial grievance or his appeal to the Superintendent. *Id.* at p.3.

In June of 2004, plaintiff Keesh brought a proceeding in New York State Supreme Court, pursuant to N.Y. Civ. Prac. L. & R. § 7803 *et seq*. (Article 78).  In his Article 78 proceeding, plaintiff alleged that the determinations made by defendants Goord and Smith regarding the practice of Tulukeesh deprived plaintiff Keesh of his constitutional right to practice his religion. The documents associated with plaintiff Keesh's Article 78 proceeding have been included at Exhibit 15 of Exhibit L of the Mans Affidavit.  Plaintiff clearly raised both his constitutional claim as well as his claim under RLUIPA. Ex. 15 at 19, 21-22.

Plaintiff Keesh's petition was dismissed ***on the merits***. Mans Aff., Ex. L, Ex. 16.  In his decision, State Supreme Court Justice E. Michael Kavanagh stated that the issue was "whether respondents have a rational basis for the manner in which they dealt with petitioner's request and ultimate grievance." *Id.* at p.2.  Justice Kavanagh determined that the prison officials acted reasonably and appropriately in responding to Keesh's request for accommodation of his religious beliefs. *Id.*  Justice Kavanagh also found that the application of Directive 4202's requirement of an outside cleric was proper, stating that the basis for such a requirement was "obvious." *Id.* at 2-3.  The court then found that petitioner's claims were "misguided and without merit." *Id.* at 3.

Plaintiff Keesh appealed Justice Kavanagh's denial of the Article 78 petition.  The Appellate Division, Third Department affirmed the denial on February 6, 2006, finding that the response to petitioner's grievance was "consistent with and served to further institutional objectives of confinement, order and safety." *Id.* Ex. 17, *Allah v. Goord*, 2006 N.Y. App. Div. LEXIS 1725 (3d Dep't Feb. 6, 2006).  The court concluded that the determination, denying

petitioner's grievance was neither "arbitrary nor capricious." *Id.*

Plaintiffs have been disciplined for violations of prison rules and regulations in connection with their efforts to practice their religious beliefs. *See e.g.* AC, Ex. 50.  They have been subjected to cell searches, and their religious papers have been seized by prison authorities.  The court does note that on December 5, 2003, plaintiff received a memorandum from defendant Smith regarding the confiscation of plaintiff Keesh's Holy Blackness book. AC, Ex. 12. Defendant Smith stated that plaintiff's book was taken during a "routine cell search" and copied for review because the staff thought that the symbols on the cover were that of an "unauthorized organization."[12] *Id.*  Defendant Smith pointed out that the staff involved in the routine cell search had no way of knowing that the book had already been reviewed by Ministerial Staff and Executive Team staff. *Id.*

Plaintiff had his book published by an outside publisher. Mans Aff. Ex. L, Ex. 22.  Exhibit 22 is a letter from plaintiff Keesh to Kathleen Shaputis of Gorham Printing, dated April 27, 2004. *Id.* Ex. 22 at p.1.  In that letter, plaintiff Keesh stated that he was enclosing money toward the order of 100 copies of the Holy Blackness, and indicated in the letter that the rest of the cost of the order would be sent by plaintiff Jova. *Id.*  Ms. Shaputis was instructed to send the bulk of the books to an address outside the facility and forward two copies to plaintiff Keesh. *Id.*  Defendants have filed an entire packet of correspondence with Ms. Shaputis regarding the publication of the Holy Blackness. (Dkt. No. 110, Ex. G)  This exhibit contains letters, drafts, and excerpts of books on self-publishing. *Id.*

---

[12] The cover of the book contains a drawing of an Ankh, with a "7" inside the Ankh; a crescent, and two stars. Mans Aff. Ex. L, Ex. 22 at p.3.

On July 26, 2004, after a cell search conducted on July 23, 2004,[13] plaintiff Keesh was charged with various violations, including engaging in martial arts; disorderly conduct; soliciting; and "unauthorized organizations/activity." AC, Exs. 49, 51.  Defendant Gorelick held a disciplinary hearing, after which plaintiff Keesh was found guilty of three of the four charges. *Id.* He was found ***not guilty*** of disorderly conduct (sparring). *Id.*  Plaintiffs have filed the transcript of the hearing as one of their exhibits. (Dkt. No. 117, Ex. 140).  Plaintiff Keesh was found not guilty of disorderly conduct because there was no evidence that he was actually seen sparring. *Id.* Although plaintiff was given penalties for the guilty dispositions, the penalties were suspended for four months and "deferred" for six months. *Id.* at p.1.  Plaintiff spent only six days in pre-hearing keeplock. *Id.*

The reasons for defendant Gorelick's disposition include that although DOCS took no position on what is or is not considered a religion, plaintiff was not entitled to proselytize. *Id.* at p.2.  At the hearing defendant Gorelick read into the record a letter, written by plaintiff in which he stated that he had been teaching Tulukeesh to other inmates at the facility. Plaintiffs' Ex. 140, Transcript of July 29, 2004 Disciplinary Hearing at 3-4.  On July 30, 2004, plaintiff received a memorandum from defendant Smith in response to a July 26, 2004 letter from plaintiff Keesh regarding his misbehavior "reports."[14] AC, Ex. 52.  The memorandum states that plaintiff Keesh had been advised "repeatedly" that he could hold any beliefs that he wished, and that he could practice his religion within the confines of his cell.  However, plaintiff had chosen to ignore this direction and attempt to recruit other inmates. *Id.*

---

[13] The documents that reflect the date of the cell searches as well as the "Contraband Receipts" have been attached at Exhibit 38 to the amended complaint.

[14] Plaintiff's July 26, 2004 letter is attached as Exhibit 60 to the amended complaint.

In the memorandum, defendant Smith referred to the disciplinary proceeding and stated that plaintiff had been counseled on the tape recording of that proceeding to stop all efforts centering on "recruitment, proselytizing and the distribution of written material." *Id.*  Finally, the memorandum stated that Directive No. 4202 prohibits this behavior, and that plaintiff's failure to comply would result in the issuance of the ***appropriate*** disciplinary charges, including refusal to obey a direct order. *Id.*

Plaintiff appealed the hearing disposition itself, and on August 9, 2004, plaintiff received another memorandum from defendant Smith, stating that although he found that the hearing was conducted appropriately, defendant Smith was reversing the charge of "Martial Arts." AC, Ex. 55.  Defendant Smith agreed with plaintiff that the misbehavior report did not fully support the martial arts violation, thus, that charge was being dismissed. *Id.*  Defendant Smith found that the penalty imposed for the other violations was appropriate. *Id.*  The Superintendent's determination was affirmed on October 8, 2004 by Donald Selsky, the Director of Special Housing and Inmate Disciplinary Program. AC, Ex. 58.  On November 9, 4004, the unauthorized organization charge was dismissed by Donald Selsky. AC, Ex. 59.

The last charge of solicitation was dismissed after an Article 78 proceeding.[15] *In re Keesh,* 26 A.D.2d 560, 807 N.Y.S.2d 733 (3d Dep't 2006).  The solicitation charge was based upon a correspondence to and from a printing company indicating that plaintiff Keesh had completed a transaction for the printing of the Holy Blackness. *Id.* 26 A.D.2d at 561, 807 N.Y.S.2d at 734. The court reversed the charge because that letter was ***not included in the record***. *Id.*  The court held that a photocopy of the book cover and a blank order form did not establish that plaintiff

---

[15] This decision was made after the filing of the amended complaint in this case.

Keesh had been in contact with a printing company to print the book or ordering copies of it. *Id.*

This court notes that it is clear, however, and plaintiffs cannot honestly dispute, that regardless of the reversal of this disciplinary hearing, plaintiffs **did** contact a publishing company and had at least **one hundred copies** of the Holy Blackness published without the Superintendent's consent.  This record contains overwhelming evidence of this fact.  *See e.g.* Dkt. No. 105, Defendants' Ex. 22 (letter to Kathleen Shaputis of Gorham Publishing enclosing partial payment for the order of 100 Holy Blackness books).  Thus, the reversal of plaintiff's July 29, 2004 disciplinary hearing in no way indicates that plaintiffs were the subject of "false" disciplinary charges.

Plaintiff Jova's cell was also searched on July 23, 2004, and he was charged with possession of contraband; unauthorized organization; solicitation of goods; practicing martial arts (attempt or conspiracy); and disorderly conduct (sparring). AC, Ex. 39.  He was accused of possessing the Holy Blackness which was plaintiff Keesh's book.  Jova was not authorized to have the Holy Blackness. *Id.*  These were very similar charges to plaintiff Keesh's charges of July 26, 2004.  Defendant Ewanciw presided as the hearing officer.[16] *Id.* Ex. 40.[17]  Plaintiff Jova was found guilty only of the contraband; unauthorized organization; and solicitation charges. *Id.* Ex. 40.  Plaintiff Jova was given a suspended sentence, but was also cautioned about his behavior. *Id.* at p.2.  Plaintiff Jova appealed the disposition, and on August 19, 2004, defendant Smith affirmed the dispositions. *Id.* Exs. 42-43.

---

[16] Plaintiff Jova also wrote to defendant Smith, who responded on July 28, 2004, telling plaintiff Jova that he should raise his concerns with the hearing officer. AC, Ex. 41.

[17] The court would point out that plaintiffs' Exs. 39 and 40, attached to the complaint, are barely legible, however, defendants have included copies of these exhibits and all of plaintiffs' other exhibits in the Mans Aff. Ex. L, Ex. 3 (Dkt. No. 105).  Thus, clearer copies of plaintiffs' Exs. 39 and 40 are contained in Defendants' Ex. 3.

Plaintiff Jova appealed the Superintendent's decision, and the dispositions were again affirmed on October 12, 2004 by Donald Selsky. *Id.* Exs. 44-45.  Plaintiff Jova then wrote to defendant Goord. *Id.* Ex. 46.  Plaintiff Jova claimed that because his charges were identical to those of plaintiff Keesh, and plaintiff Keesh had some of his charges dismissed, then some of plaintiff Jova's charges should be dismissed also. *Id.*  As a result of plaintiff Jova's letter, Lucien J. LeClaire, Jr., Deputy Commissioner, forwarded a copy of plaintiff Jova's arguments to Donald Selsky for "reconsideration." *Id.* Ex. 47.  On February 3, 2005, Donald Selsky dismissed the charge of unauthorized organization, but affirmed the "suspended" penalty for the other charges. *Id.* Ex. 48.

Both plaintiffs filed grievances after the July 23, 2004 cell search and subsequent disciplinary charges. *Id.* Exs. 62 (Keesh); 64(Keesh); 70 (Keesh) and 63 (D'Lucca[18]/Jova). Plaintiff Keesh's first grievance reiterated his desire to practice Tulukeesh as *he* saw fit and complained that he was experiencing more illness because his dietary needs were not being accommodated. *Id.* Ex. 62.  Plaintiff Jova complained that the material that had been confiscated from his cell on July 23, 2004 should have been returned to him. *Id.* Ex. 63.  Plaintiff Keesh's grievance was denied at all levels. *Id.* Ex. 62 at pp.2-4.  Although the IGRC found that because the materials confiscated from plaintiff Jova were never "labeled" contraband, they should have been returned to him, the Superintendent denied the grievance finding that the materials were the subject of a disciplinary hearing after which plaintiff Jova was found guilty. *Id.* Ex. 63 at pp.2-3.

Plaintiff Keesh's second grievance, dated August 5, 2004, also complained about the July 23, 2004 cell search and alleged that his property was not returned, he could not pursue his "legal

---

[18] Plaintiff Jova's name was originally D'Lucca, and some of the documents in the record refer to plaintiff Jova as D'Lucca.

action" in court, and he could not write to his family. *Id.* Ex. 70.  Plaintiff also claimed that

defendant Smith's order not to proselytize was not being given to other religious groups or people.

*Id.*  On September 9, 2004, defendant Smith denied the grievance and held that plaintiff's cell was

searched "as part of an ongoing investigation into his . . . attempts to recruit followers of his self-

developed religion" despite being given orders not to do so. *Id.* at p.2.  Defendant Smith further

held that the cell search was made in accordance with DOCS Directive No. 4910. *Id.*  The CORC

affirmed the Superintendent's findings and stated that there is no requirement in Directive 4910

that an inmate be present at the time of a cell search. *Id.* at p.3.  The CORC also stated that

plaintiff Keesh was afforded all of his procedural rights at the disciplinary hearing and subsequent

appeals.  Finally, the CORC found that there was insufficient evidence to establish either a claim

of retaliation or of discrimination. *Id.*

Plaintiff Keesh's third grievance was dated September 8, 2004. *Id.* Ex. 64.  This grievance

challenged the July 23, 2004 cell search and claimed that the search was in retaliation for plaintiff

filing the Article 78 proceeding. *Id.* Ex. 64.  Plaintiff also claimed that he was being denied access

to courts as the result of the cell search. *Id.*  The IGRC issued a "split" determination. *Id.* at p.2.

Part of the committee found that since the material was never considered contraband, it should

have been returned, but another part of the committee found that the material was "determined to

be unauthorized group materials." *Id.* at p.2.  Plaintiff Keesh appealed, and at the Superintendent's

level, defendant Smith denied the grievance, stating that the materials were being reviewed, and

that officials would return the materials that plaintiff was entitled to possess. *Id.* at p.3.  On

November 24, 2004, the CORC held that the cell search was ***not*** retaliatory, nor was it conducted

to deprive plaintiff of his access to courts. *Id.* at p.4.

The CORC decision also stated that plaintiff Keesh's book had been referred to the Central

16

Office Media Review Committee, which determined that the book did not violate any of the guidelines set forth in DOCS Directive No. 4572. *Id.* However, based upon plaintiff Keesh's "unique circumstances" as the "self-proclaimed savior or holy prophet of the Tulukeesh religion" the book would remain in the possession of the facility chaplain. *Id.* The plaintiff would be able to have reasonable access to his book in the chaplain's office. *Id.*

On September 20, 2004, defendant Smith sent plaintiff Keesh a memorandum stating that all material that was deemed contraband and confiscated as a result of the July 24, 2004 disciplinary hearing was placed in plaintiff's personal property in the IRC Office. *Id.* Ex. 66. Defendant Smith stated that he was making the "exception" because of plaintiff Keesh's "open litigation relative to this matter," and that the material to which the plaintiff was entitled would be returned to him. *Id.* On September 21, 2004, plaintiff signed a receipt for some of his property. *Id.* Ex. 67.

On September 23, 2004, the Facility Media Review Committee sent plaintiff Keesh its decision that certain pages of the Holy Blackness should be removed because according to DOCS Directive No. 4572, these pages "may incite disobedience." *Id.* Ex. 68. Plaintiff Keesh appealed that decision. *Id.* at pp.2-3. On October 28, 2004, plaintiff complained to defendant Goord about the delay in plaintiff's appeal. *Id.* Ex. 69.

On December 28, 2004, plaintiff Keesh filed another grievance after a December 15, 2004 cell search. *Id.* Exs. 72-73. In this grievance, plaintiff complained that the corrections officer who searched plaintiff's cell damaged some of his property and that plaintiff had been having problems with this officer retaliating against plaintiff because of his religion. *Id.* Plaintiff requested an investigation and the return of a confiscated notebook. *Id.* The IGRC stated that it did not have enough information to decide the issue, but at the Superintendent's level, defendant Smith stated

17

that the search was "part of the daily random searches." *Id.* at p.3.  Superintendent Smith found that although the notebook was confiscated, it was being held "pending an ongoing investigation." *Id.*  The grievance was denied as without merit. *Id.*  The CORC affirmed the Superintendent's decision on February 16, 2005. *Id.* at p.4.

In January of 2005, defendant Nuttal advised plaintiff Keesh that publication of the Tulukeesh holy book without the Superintendent's permission violated facility rules, and that officials had determined that unlimited access to the book in plaintiff's cell would pose a risk that plaintiff could gain undue influence over other inmates. AC, Ex. 75.[19]  The letter reiterated the determination that although the book did not violate any of the guidelines set forth in DOCS Directive No. 4572, the Holy Blackness would remain in the facility Chaplain's possession, and plaintiff would be able to have periodic and reasonable access to his book upon request in the Chaplain's office.[20]  This decision was made after a discussion with Deputy Commissioner and Counsel Anthony J. Annucci and defendant Smith. *Id.*

The letter stated that "because you have declared yourself the savior with regard to this faith, this could lead to your gaining undue power or importance with other inmates." *Id.*  Finally, defendant Nuttal stated that allowing the Chaplain to retain possession of the book was a reasonable compromise, balancing plaintiff Keesh's interests in practicing his faith and expressing himself in writing, with the facility's concern for the safety and security of staff and the inmate population. *Id.* at p.2.

---

[19] As stated in this court's decision denying the motion for preliminary injunction, the letter from defendant Nuttal is dated January 7, 2004, but the correct date is January 7, 2005 since the letter followed a memorandum from defendant Gorelick, dated December 2, 2004, regarding the Holy Blackness. AC, Ex. 71.

[20] Plaintiff Keesh was also informed of this decision by defendant Gorelick in a memorandum dated December 2, 2004. AC, Ex. 71.

3.      **Collateral Estoppel**

Defendants argue that this action is barred by collateral estoppel based upon Supreme

Court Justice Kavanagh's denial of plaintiff's Article 78 proceeding on the merits and the

Appellate Division's affirmance of that decision. Defendants' Memorandum of Law at 20-23.

Plaintiffs argue that the decision in the Article 78 proceeding should not bar this action because

only *one* of the plaintiffs was a party to that proceeding, the proceeding did not afford plaintiff

Keesh a full and fair opportunity to be heard, and some of the factual circumstances in this action

occurred after the decision in the Article 78 proceeding.

Under the Full Faith and Credit Statute, 28 U.S.C. § 1738, the federal court must afford a

prior state court judgment the same preclusive effect that the judgment would be given in the

courts of the state in which it was decided. *Giakoumelos v. Coughlin*, 88 F.3d 56, 59 (2d Cir.

1996)(citing *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 466 (1982)).  Pursuant to New

York law, the doctrine of collateral estoppel applies when a litigant in a prior proceeding asserts an

issue of fact or law in a subsequent proceeding, the issue has been ***necessarily decided*** in the prior

action, is decisive of the present action, and the litigant had a full and fair opportunity in the prior

action to contest the decision. *Id.* (citing *Schwartz v. Public Administrator*, 24 N.Y.2d 65, 71, 298

N.Y.S.2d 955, 246 N.E.2d 725 (1969)).

The party asserting issue preclusion bears the burden of showing that the identical issue

was decided in the prior proceeding, and the party opposing issue preclusion bears the burden of

showing the absence of a full and fair opportunity to litigate in the prior proceeding. *Colon v.

Coughlin*, 58 F.3d 865, 869 (2d Cir. 1995)(citation omitted).  The court must examine the state

court proceedings closely to determine what was decided in that forum. *See Rifkin v. Goord*, 99-

CV-6479, 2005 U.S. Dist. LEXIS 6353, *10 (W.D.N.Y. Mar. 31, 2005).  The court in *Rifkin*

closely examined the record of the state court proceedings, together with the resulting decisions. *Id.* *11-12.  The court found that the Appellate Division had specifically ruled on plaintiff's **constitutional** claims, the claims were identical to those brought in the federal court, and that the plaintiff had a full and fair opportunity to be heard since plaintiff was "vigorously represented." *Id.* at *11-16.

In this case, plaintiffs bring their claims under both the Constitution and the RLUIPA, 42 U.S.C. § 2000cc-2(a).  RLUIPA is an independent cause of action, with a slightly different standard and must be treated separately from the First Amendment claim. *See Jones v. Goord*, 435 F. Supp. 2d 221, 260 (2006)(citing cases in which both district and circuit courts have analyzed Free Exercise and RLUIPA claims independently).  The Mans Affidavit contains an exhibit, consisting of what appear to be the papers relating to plaintiff's Keesh's Article 78 proceeding. Mans Aff. Ex. 15.  Justice Kavanagh's decision as well at the Appellate Division's decision affirming the Supreme Court have also been made part of the record. Mans Aff. Exs. 16-17.  The court does note, however, that no opposition papers by the respondent DOCS officials in the state court action have been included with the Article 78 documents.

A review of these exhibits shows that although plaintiff Keesh clearly raised both his constitutional claim and his RLUIPA claim, neither Justice Kavanagh nor the Appellate Division ever mentioned the constitution, RLUIPA, or their respective standards.  Plaintiff Keesh brought the state action, challenging the denial of his December 3, 2003 grievance, in which he alleged that DOCS officials were not allowing him to properly practice his religion. Mans Aff. Ex. 15 at p.23-51.  It is difficult to determine exactly what standards were used because Justice Kavanagh did not cite any cases in support of his decision.  He stated that the "issue" was whether respondents had a "rational basis" for the manner in which they dealt with plaintiff Keesh's request and "ultimate

20

grievance." Mans Aff. Ex. 16 at 2. He also found that DOCS officials acted "reasonably and appropriately" and that the reason behind requiring outside clergy was "obvious." *Id.* at p.3.

The Appellate Division found that the DOCS officials' response to plaintiff Keesh was "consistent with and served to further the institutional objectives of confinement, order, and safety." Mans Aff. Ex. 17. The court further found that the determination denying plaintiff's grievance was not "arbitrary and capricious." *Id.* In its decision, the Appellate Division cited *Rivera v. Smith*, 63 N.Y.2d 501, 483 N.Y.S.2d 187, 472 N.E.2d 1015 (1984). *Rivera* relied on New York State law and the New York State Constitution in finding that a Muslim plaintiff's religious rights may have been violated when he was subjected to a pat frisk by a female officer. *Id.* The court would first point out that *Rivera* was decided in 1984, and the constitutional standard currently used for reviewing inmates federal constitutional challenges was articulated in *O'lone v. Estate of Shabazz*, 482 U.S.342 (1987) and *Turner v. Safely*, 482 U.S. 78, 84 (1987), cases decided ***three years after*** the case cited by the Appellate Division. While the *O'Lone/Turner* standard as discussed more specifically below, ultimately focuses upon whether the challenged action is reasonably related to legitimate penological interests, and uses similar language to that used by the Article 78 court in this case, RLUIPA imposes a more "exacting standard" on prison officials, requiring that "any substantial burden on an inmate's exercise of religion be warranted by a 'compelling governmental interest,' and be the 'least restrictive means' of accomplishing that interest." *Rahman v. Goord*, 04-CV-6368, 2007 U.S. Dist. LEXIS 32680, *15 (W.D.N.Y. May 3, 2007)(quoting 42 U.S.C. § 2000cc-1(a)(1)-(2)).

Nothing in either Justice Kavanagh's opinion, nor in the Appellate Division's decision indicates that plaintiff's claims were considered under the more exacting RLUIPA standard. Thus, plaintiffs' RLUIPA claims in this case were not "necessarily decided" in the state court, and it is

even questionable whether plaintiffs' constitutional claims were "necessarily decided" by the State courts.  This court also finds that given plaintiff Keesh's pro se status in the Article 78 proceeding, he could not have represented plaintiff Jova's interests effectively, and that neither plaintiff had a "full and fair opportunity to be heard."  There was also no mention of retaliation in the State court proceedings, a claim that plaintiffs specifically state in their motion papers that they wish to bring in this case.

Based on these findings, this court declines to apply collateral estoppel to bar any of plaintiff's claims, and will proceed to consider the merits.

## 4.  **Religious Freedom**

### A.  First Amendment Free Exercise Claim

It is well-settled that inmates have the right under the First and Fourteenth Amendments to freely exercise a chosen religion. *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003)(citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).  However this right is not limitless, and may be subject to restrictions relating to legitimate penological concerns. *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir.), *cert. denied*, 498 U.S. 951 (1990).  As stated above, the analysis of a free exercise claim is governed by the framework set forth in *O'lone v. Estate of Shabazz*, 482 U.S.342 (1987) and *Turner v. Safely*, 482 U.S. 78, 84 (1987).  This framework is one of reasonableness and is less restrictive than ordinarily applied to the alleged infringements of fundamental constitutional rights. *Ford*, 352 F.3d at 588.

In *O'Lone*, the Supreme Court held that a regulation that burdens a protected right withstands a constitutional challenge if that regulation is reasonably related to legitimate penological interests. 482 U.S. at 349 (quoting *Turner*, 482 U.S. at 89).  An individualized decision to deny an inmate the ability to engage in a religious exercise is analyzed under the same

22

standard. *Salahuddin v. Goord*, 467 F.3d 263, 274 n.4 (2d Cir. 2006)(citations omitted).  In *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988), the Second Circuit held that to assess a free exercise claim, the court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological interest."

The court must examine whether the challenged action has a legitimate, rational connection to the governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating that right; and the existence of alternative means of facilitating the exercise of that right that have only a *de minimis* adverse effect on the valid penological interests. *See King v. Bennett*, 2007 U.S. Dist. LEXIS 27702, *12-13 (W.D.N.Y.  March 30, 2007)(citing *Salahuddin*, 467 F.3d at 274). Finally, once prison officials state a legitimate penological interest to justify their actions, the burden shifts to plaintiffs to show that the defendants' concerns are "irrational." *Ford*, 352 F.3d at 595.  This court will examine each of the relevant factors in relation to the plaintiffs' claims.

### (i)  "Religiosity" and Sincerity

In determining whether a prisoner's particular religious beliefs are entitled to free exercise protection, "the relevant inquiry is not whether as an objective matter, the belief is 'accurate or logical.'" *Jackson v. Mann*, 196 F.3d 316, 320 (2d Cir. 1999)(citing *Jolly v. Coughlin*, 76 F.3d 468, 476 (2d Cir. 1996)).  Rather, the inquiry is whether the plaintiff's beliefs are "'*sincerely* held and whether they are, in his own scheme of things, religious.'" *Id.* (quoting *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984)).  A sincerity analysis "seeks to determine an adherent's good faith in the expression of his religious belief." *Patrick*, 745 F.2d at 157 (citing *International*

23

*Society for Krishna Consciousness v. Barber*, 650 F.2d 430, 441 (2d Cir. 1981)).  The test allows the court to differentiate between beliefs that are held as a matter of conscience and those that are motivated by deception or fraud. *Id.*

Courts recognize that they are "'singularly ill-equipped to sit in judgment on the verity of an adherent's religious beliefs.'" *Ford*, 352 F.3d at 588 (quoting *Patrick*, 745 F.2d at 157).  Thus, in analyzing this first factor, courts have rejected an objective, content-based approach in favor of a more "subjective definition of religion, which examines an individual's inward attitudes towards a particular belief system." *Id.* (citations omitted).  The Second Circuit has adopted an "expansive" definition of "religion" as "the feelings, acts, and experiences of individual men in their solitude, so far as they apprehend themselves to stand in relation to whatever they may consider the divine." *Patrick*, 745 F.2d at 158 (quoting *United States v. Moon*, 718 F.2d 1210, 1227 (2d Cir. 1983)(quoting W. James, THE VARIETIES OF RELIGIOUS EXPERIENCE 31 (1910)).

According to this subjective test, plaintiff does not have to be a member of a particular religious organization. *Ford*, 352 F.3d at 589 (quoting *Frazee v. Illinois Dep't of Employment Security*, 489 U.S. 829, 834 (1989)). *See also Jackson v. Mann*, 196 F.3d 316, 321 (2d Cir. 1999) (holding that the question whether plaintiff's beliefs were entitled to Free Exercise protection turned upon whether those beliefs were 'sincerely held', not on the 'ecclesiastical question' of whether the plaintiff was in fact a Jew under Judaic Law).  It is also impermissible for the court to deny First Amendment protection simply because the court finds that the inmate's sincere belief is "objectively incorrect" according to the tenets of his religion. *Ford*, 352 F.3d at 590-91.

Thus, in *Jackson*, the court held that the opinion of religious authorities that the plaintiff was not Jewish was not determinative of whether the plaintiff was "sincere" in his belief that he was Jewish and whether he was entitled to a kosher diet. 196 F.3d at 320.  In *Patrick*, the Second

24

Circuit reversed the district court's grant of summary judgment for defendants in a case in which the prison officials did not believe that the plaintiff's beliefs constituted a religion.[21] 745 F.2d at 157.

Notwithstanding the adoption of a subjective standard, the Supreme Court has also articulated what the Second Circuit has referred to as a "limiting principle" to assist courts in applying this broad subjective test. *Ford*, 352 F.3d at 589 (quoting *Frazee*, 489 U.S. at 834 n.2). In *Frazee*, the Supreme Court stated that "an asserted belief might be 'so bizarre, so clearly nonreligious in motivation, as not to be entitled to protection under the Free Exercise Clause.'" 489 U.S. at 834 n.2 (quoting *Thomas v. Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707. 715 (1981)).

In the decision, denying plaintiffs' first[22] motion for preliminary injunction in this case, this court stated that "a thorough reading of the record, particularly Keesh's writings, provides substantial support for the view that plaintiffs are principally motivated not by religious impulses but rather by the desire to achieve a more congenial lifestyle during their incarceration." (Dkt. No.

---

[21] The plaintiff in *Patrick* had petitioned for DOCS to recognize the "Five Percenters" as a valid religious group within the facility. 745 F.2d at 155.  Patrick sought permission to "practice, exercise, promulgate, and gather together with others for the purpose of worshiping his faith of Islam, as a 'Five Percenter.'" *Id.*  His request was denied because the "Five Percenter Nation of Islam is not recognized as a religious group." *Id.*

[22] Plaintiffs initially moved for a preliminary injunction on May 2, 2005, and filed another motion for a preliminary injunction on May 25, 2005. (Dkt. Nos. 31, 36).  Plaintiffs also moved to disqualify defense counsel in conjunction with the motion for a preliminary injunction. (Dkt. No. 37).  This court considered all of these motions as one motion for preliminary injunction and denied the motion on March 2, 2006. (Dkt. No. 79).  Plaintiff appealed the denial of the motion to the Second Circuit and moved for "appointment of counsel and a preliminary injunction." (Dkt. No. 80, 114).

On August 24, 2006, the Second Circuit denied the two motions and dismissed the appeal "because it lacks an arguable basis in law or fact." (Dkt. No. 114)(citing *Neitzke v. Williams*, 490 U.S. 319, 325 (1989); 28 U.S.C. § 1915(e)).  The Mandate from the Second Circuit was issued on January 23, 2007 and filed on the Northern District docket on February 7, 2007. (Dkt. No. 114).  In the interim, plaintiffs filed ***another*** motion for preliminary injunction on November 13, 2006 which this court denied on May 3, 2007. (Dkt. Nos. 91, 120).

79 at p.9). As a result, the court found that plaintiffs had **not** demonstrated a likelihood that a fact-finder would conclude that they are espousing sincerely held religious beliefs that are entitled to free exercise protection. *Id.* at pp.9-10.

As many courts have held, a determination of whether beliefs are "sincerely held" is often a question of fact and requires the court to "delve into the internal workings of [plaintiffs' minds] and assess the credibility of [their] claims." *Patrick*, 745 F.2d at 158, *cited in Marria v. Broaddus*, 200 F. Supp. 2d 280, 292 (S.D.N.Y. 2002)(denying summary judgment to defendants in a Five Percenters' case). In their motion for summary judgment in this case, defendants do not specifically argue that plaintiffs have not established the sincerity of their beliefs.[23] Rather, defendants focus upon their argument that they have **properly** responded to plaintiffs requests in keeping with both legitimate and compelling governmental interests, as well as acting consistently with valid DOCS directives.

Plaintiffs argue in their motion for summary judgment that defendants have already "deemed" Tulukeesh as a "bona fide" religion, "and deemed Plaintiffs sincere in their beliefs." Plaintiffs' Memorandum of Law at p.10 (Dkt. No. 112). Defendants respond to this argument by stating that although it is true that DOCS does not attempt to determine religious sincerity, the facts in this case show that "'Tulukeesh' is a disingenuous attempt on behalf of plaintiffs to obtain special privileges and accommodations from DOCS under the First Amendment and RLUIPA 'sincerity' rubric.'" Defendants' Reply Memorandum of Law at 3. However, the defendants also state that "this case essentially distills to the defendants' reasonable accommodations of plaintiffs'

---

[23] Defendants make one statement in their RLUIPA argument stating that there are "legitimate concerns regarding the sincerity of both plaintiffs' beliefs." Defendants' Memorandum of Law at 15. However, this statement is made in support of the argument that defendants have tried to accommodate plaintiffs' beliefs without compromising DOCS's compelling interest in maintaining security and order.

religious demands, given legitimate prison safety, security, and administrative concerns." *Id.*  It appears that ***for purposes of these motions for summary judgment***, defendants are not arguing the sincerity of plaintiffs' beliefs.

Given the difficulty of analyzing sincerity and religiosity, particularly in cross-motions for summary judgment, and even though this court has some ***serious*** questions regarding the sincerity of plaintiffs' beliefs, the court will proceed to consider the remaining factors in the constitutional test.

### (ii)  Substantial Burden

Assuming that the plaintiffs' beliefs are sincere and "religious," the second factor of the test is not difficult to analyze.  Plaintiffs' list of requirements is very lengthy, and these requirements include the need for specific foods on specific days; the need to have their food prepared only by other Tulukeesh adherents; the prohibition on being nude in front of anyone who is not a member of Tulukeesh; the need for a ***professional*** martial arts trainer and sparring equipment to be provided; and the need for congregate services.

The defendants' response would allow plaintiffs to practice their religion in their own cells; but refuses to consider Tulukeesh a formal religion within DOCS until an outside clergy volunteer can be found and approved; refuses to allow martial arts and sparring; refuses to allow congregate services; refuses to allow either plaintiff to keep the Holy Blackness in his cell; and refuses to allow plaintiff Keesh to obtain new members of his religion by discussing it with others.  Clearly, the defendants' requirements are a "substantial burden" on the exercise of plaintiffs' stated religion.

### (iii)  Legitimate Penological Interests

The next question is whether defendants' response is reasonably related to legitimate

penological interests.  In support of their motion for summary judgment, defendants have

submitted the affidavit of defendant Mark Leonard, the Director of Ministerial, Family, and

Volunteer Services for DOCS. Leonard Decl.[24]  In his declaration, he states that DOCS has

identified and recognized several religions which have a large inmate following as well as several

others with fewer members including Catholic, Protestant, Jewish, Muslim, Nation of Islam,

Rastafarian, Native American, and Santeria. Leonard Decl. ¶¶ 2-3.  These religions have been

accommodated for group activities. *Id.*  DOCS policy is outlined in Directive 4202.

 Once a religion has been recognized for group activities, DOCS will allow regular services,

holiday services, will meet special dietary needs, allow religious symbols, allow religious

materials, and provide a place to worship as a group. *Id.* ¶ 5.  According to Directive 4202, in

order for DOCS to allow congregate religious services and classes, the religion must have a body

of dogma, a religious leader ***outside*** of the prison, and some tradition indicating that the religion

has roots and a "bona fide" structure outside of the prison. *Id.* at ¶ 6.  Defendant Leonard states

that this requirement "serves several purposes." *Id.* at ¶ 77-78.  First, the existence of an outside

sponsor can authenticate an inmate's religious claim, ensuring that the congregate services are for

religious purposes as opposed to an "improper goal." *Id.* ¶ 77.  Additionally, the outside sponsor

works with DOCS to determine what holidays and special observances are necessary so that

DOCS may decide "how best to accommodate the inmate's religious needs while taking into

consideration the security and administrative concerns of the facilities." *Id.* at 78.

 Plaintiffs argue that Directive No. 4202 provides for inmates to practice their religion

***without*** the use of outside clergy, showing that defendants are violating their own directives as

---

[24] The Leonard Declaration has been filed as part of Dkt. No. 101.

well as treating plaintiffs differently than inmates of other religions.  A copy of Directive No. 4202 has been made a part of the Mans Affidavit at Exhibit H. (Dkt. No. 103).  Plaintiffs rely upon sections 4202(C) and 4202(F)(2)(a)[25] for their argument.  Plaintiffs are misreading what is allowed by these sections.

Section 4202(C) initially states that in situations in which an inmate's faith may not be represented by a "chaplain at his or her resident facility, the inmate may encourage an outside clergyperson [sic] to contact the coordinating chaplain and apply to become a registered religious volunteer."   The next sentence states that

> if a chaplain or an outside religious volunteer is not available to serve the spiritual needs of a group of inmates *of a known religious faith*, the facility Superintendent, in consultation with the Director of Ministerial and Family Services, *may authorize* the inmates to participate in a religious education class, study group or congregate worship service up to once per week with an approved inmate acting as facilitator and with security staff present.

*Id.* (emphasis added).  Defendant Leonard is correct in stating that this section refers only to inmates of a "known" religion, and not those who are seeking to have a religion recognized or inmates that have created their own religion.  While the state interest in monitoring group services may not be as great when the religion has a foundation outside of the prison, clearly when the religion is one that has been created by one of the inmates and for which he claims to be the Savior, there is certainly an legitimate interest in ensuring that a "religion" does not become an excuse for gang-related or other improper activities.[26]  This court finds that the enforcement of

---

[25] Section 4202(F)(2)(a)(3) discusses requests for an "authorized" inmate to act as a facilitator at religious education meetings or group worship.  This section is merely a section to implement procedures for what is allowed in section 4202(C).  It is not an independent section allowing for inmate facilitators without outside sponsors generally.

[26] This court is not making any determinations regarding Tulukeesh itself, however; regulations are *not* written for one particular group of inmates, and thus, the state interest in avoiding unauthorized organizations is the same regardless of how sincere the beliefs of any particular group might be.

DOCS Directive 4202 is reasonably related to legitimate penological interests.

The court would point out that the outside sponsor requirement of Directive 4202 has been upheld in the Second Circuit as well as the district courts as relates to a Free Exercise challenge *See Benjamin v. Coughlin*, 905 F.2d 571, 577 (2d Cir. 1990); *Persad v. Savage*, 02-CV-336, 2004 U.S. Dist. LEXIS 13766 (W.D.N.Y. May 25, 2004)(Foschio, M.J.), *adopted*, 2004 U.S. Dist. LEXIS 16651 (W.D.N.Y. Aug. 19, 2004).  The court held in *Persad* that the "policy of only permitting facility approved supervisors for religious programming is rationally related to legitimate penological interests and the inmates have alternative means to exercise their right to the free exercise of religion in the absence of a state approved sponsor." *Id.* 2004 U.S. Dist. LEXIS 13766 at *13-14.  The alternative to which the court referred was the ability to exercise their religion individually in their cells.[27] *Id.* *6.

Notwithstanding the refusal to recognize Tulukeesh as a specific religion within DOCS or to allow plaintiff Keesh to conduct group classes or services on his own with other inmates, defendants have allowed plaintiffs the ability to practice their religion in their own cells, and although defendants have not allowed them to have the Holy Blackness in their cells, they have allowed the book to be maintained in the Chaplain's office.  Plaintiffs may have access to this book upon request in the Chaplain's office.  Although defendants state that they cannot comply with the detailed dietary requests from plaintiffs, defendants state that the plaintiffs may opt for the religious alternative (meatless) diet.

Plaintiffs argue that they do not need a spiritual advisor because plaintiff Keesh is the Savior and teacher of the religion, and even if there were an outside member of the clergy,

---

[27] The court understands that the issue in ***Persad*** was that a small number of services were cancelled because the chaplain was on vacation.  However, the policy was challenged as a whole.

defendants would be "indirectly" dealing with plaintiff Keesh.  AC, Ex. 5.  This argument is an excellent example of why Directive 4202 is reasonable and why both the directive and the defendants' response to plaintiffs' requests are related to legitimate penological interests.  There is a legitimate safety and security interest in not having one inmate set himself up as "God" or the "Savior."  There would be no way of regulating what requests for accommodations would be made in the name of religion.  A review of the alleged requirements of Tulukeesh illustrate this very concern.

Regardless of the sincerity of the plaintiffs' beliefs, it is neither unreasonable nor discriminatory to refuse to allow plaintiffs a professional martial arts trainer and sparring equipment.  As defendants point out, one of the DOCS disciplinary rules specifically prohibits such activity, providing that "inmates shall not practice or instruct others in martial arts."  Standards of Inmate Behavior, Rule 100.14.  There is another rule prohibiting "unauthorized sparring" or disorderly conduct. *Id.* Rule 100.15.

Tulukeesh adherents may not be naked in front of people who are not "of us." AC Ex. 1 at p.5.  This requirement would prevent the staff from performing necessary strip frisks.  Clearly, the ability to conduct these frisks, if necessary, is a legitimate security concern in order to avoid the smuggling of contraband.  Tulukeesh dietary laws would also be an administrative as well as a financial burden on defendants.  A review of the "requirements" that are contained in plaintiff Keesh's October 14, 2003 letter shows that they are ***very restrictive***, necessitating specific foods on specific days of the week. AC Ex. 1, Mans Aff. Ex. A.  Plaintiffs also state that they must eat separately from the general population because they wish to avoid watching people who eat meat. *Id.* at pp.1-3.

Defendant Leonard states that plaintiffs were offered DOCS "alternative" diets, as well as

31

the general confinement menu that allowed them to choose a "religious/meatless" entree at both lunch and dinner. Leonard Decl. ¶ 85.  DOCS also affords inmates the opportunity to discuss their diet with a medical provider for evaluation and prescription of a "medical" diet. *Id.*  Defendant Leonard states that both plaintiffs have exercised the opportunity to be placed on an "alternative" diet. *Id.* & Dkt. No. 68, Smith Aff., Ex. D (memorandum from Food Service Administrator). Plaintiff Keesh has been registered for the alternative meal program since June 12, 2003. *Id.* Dkt. 68, Ex. D at p.2.  Plaintiff Jova has been registered for the alternative meal program since January 5, 2004.  This exhibit was initially filed as Exhibit D to defendant Smith's affidavit in response to an order by Magistrate Judge DiBianco, requesting more information regarding plaintiffs' nutrition.[28]  In addition to being able to choose meatless entrees, plaintiffs have been able to, and have, supplemented their diets with purchases from the commissary. Dkt. No. 68, Smith Aff. Ex. E.  Many of the foods chosen by plaintiffs are the foods that they say they must consume on their religious diet. *Id.*

According to plaintiff Keesh, Tulukeesh adherents must eat fresh navy beans four times per week, and they must eat a vegan (not simply meatless) diet, but cannot have soybeans. Mans Aff. Ex. A.  Plaintiff Keesh also states that Tulukeesh adherents "have fixed diets," and certain foods must be eaten on certain days. *Id.* at p.2.  As an example, on Sundays, plaintiffs must eat brown rice, corn, black beans, onions, cashew nuts, sunflower seeds, plantains, pineapples, garlic, olive oil, and hot peppers. *Id.*  On Mondays, however, they must eat brown rice, navy beans, carrots, green peppers, sweet potatoes, honey, cinnamon, lettuce, tomatoes, cucumbers, and strawberries. *Id.*  The list continues with each day of the week having a different combination of foods. *Id.*

---

[28] Plaintiffs had alleged that they could not be deposed due to malnutrition, causing a lack of concentration and focus, as the result of being refused their religious diets. *See* Dkt. Nos.  64, 65, 68).

Although plaintiffs argue strenuously that meeting their dietary requirements would be less costly than the kosher meal program that DOCS allows, plaintiffs arguments are misplaced.  Cost is ***not*** the only legitimate interest involved in accommodating plaintiffs' requests. *See Lee v. Wenderlich*, 05-CV-6077, 2006 U.S. Dist. LEXIS 67731, *17 (W.D.N.Y. Sept. 21, 2006)(stating that the conservation of administrative ***and*** financial resources is recognized as a legitimate penological interest).  There is a large ***administrative*** burden in what plaintiffs are asking defendants to do.  Plaintiffs are not asking simply for a vegetarian or vegan diet.  They are asking for a vegan diet without soybeans,[29] and they are requesting ***specific foods on specific days***.  The food must also be prepared by a Tulukeesh adherent.  None of the diets allowed by DOCS is as restrictive as the diet that plaintiffs propose.  Although plaintiffs take issue with defendants' statement that they may purchase additional food items, this has been upheld in other court decisions involving religious diets. *See Smith v. Nuttal*, 04-CV-200, 2007 U.S. Dist. LEXIS 18354, *21 (W.D.N.Y. March 14, 2007).

Defendant Leonard points out in his declaration that it is not only the dietary requirements that would pose an enormous administrative burden, but all the plaintiffs' requirements considered together that would cause a great administrative as well as a security burden. Leonard Decl. ¶¶ 46-70.  Regulations such as Directive No. 4202 must exist in order to properly process the varied requests that might be made for religious accommodations with respect to congregate services and religious education classes.

---

[29] However, the court finds it interesting that the plaintiffs do not wish to eat soybeans but have requested "soya" milk, a beverage made from soy beans. Mans Aff. Ex. A at pp.2-3.  The court also notes that plaintiffs themselves have submitted exhibits in support of their motion for summary judgment, espousing the benefits of a vegan diet. (Dkt. No. 112 ).  These documents, however, not only list soybeans as one of the main sources of iron in a vegan diet, but ***none*** of the documents indicate that certain foods must be eaten on certain days. (Dkt. No. 112, Ex. 131 at p.5 (follows Exhibit 129).

With respect to possession of the Holy Blackness, defendants argue that it is impossible for them to enforce a requirement that plaintiff and other Tulukeesh adherents keep the book in their cells at all times. Leonard Decl. ¶ 91.  Defendants' concern is that plaintiffs will use the Tulukeesh literature outside of their cells in an effort to participate in unorganized group activity. *Id.*  In a footnote, defendant Leonard expresses concern about plaintiff Keesh creating his own language, grammar, and alphabet. *Id.*  At plaintiff Keesh's deposition, he testified that the Creator imparted this language and grammatical structure to Keesh alone. Keesh Dep. at 158-59.  In a footnote, defendant Leonard emphasizes that inmates readily use codes to communicate group-based activities. *Id.* ¶ 91 n.3.  The court also notes that the Holy Blackness was not removed from plaintiffs' cells until it became apparent that they were attempting to recruit other inmates.

One of the defendants' main concerns is that plaintiff Keesh has set himself up as the Savior and teacher of Tulukeesh, implicating an even greater safety and security concern than normally associated with a spiritual or religiously based belief system in prison. *Id.* ¶ 92.  At plaintiff Keesh's deposition, in addition to confirming that the Creator speaks through plaintiff, he stated that he is the ***sole*** authority for the religion, he determines the result if there is a difference of opinion regarding the interpretation of anything related to Tulukeesh, that anyone who is Tulukeesh must accept the Holy Blackness, and that anyone who disagrees with plaintiff Keesh may no longer be a member of the Tulukeesh religion. Keesh Dep. at 121-24.

Plaintiff also stated that all Tulukeesh adherents are innocent of the crimes of which they have been convicted and should be returned to free society. Keesh Dep. at 193.  There is no reason for Tulukeesh followers to be in prison. *Id.*  Plaintiff Keesh stated that plaintiff Jova was innocent, and Keesh knew this because the Creator told him "through a voice" that Jova was innocent. *Id.* at 194.  Plaintiff Keesh also stated at his deposition that there were ***no alternative ways*** for him to

34

practice his religion, other than the ways listed in his letter of October 14, 2003. *Id.* at 198.

Plaintiff Keesh stated that he did attempt to obtain an outside minister or sponsor for his religion, but was not successful. *Id.* at 216-17.  Defendants have submitted letters sent by plaintiff Keesh to various individuals outside the prison in an attempt to locate an outside sponsor. Defendants' Dkt. No. 110, Exs. A-C.  Keesh stated at his deposition that there were other members of Tulukeesh in prison, but that ***he*** did not attempt to have them convert to Tulukeesh,[30] rather, they were "accepted by a designee." *Id.* at 217.  Plaintiff would not reveal the name of the "designee." *Id.* at 217-18.  At plaintiff Jova's deposition, he stated that he believed that plaintiff Keesh was "divinely inspired" to designate his mother's and his grandmother's birthday as  holy days, and would not question that decision. Jova Dep. at 70, 73.  Plaintiff Jova also testified that the only person who could designate a "leader" in the religion was plaintiff Keesh. *Id.* at 88. Plaintiff Jova stated that although followers of Tulukeesh do not believe in taking DOCS programs, that rule only applies if one is being "forced" to take a program. *Id.* at 90.  This rule does not apply if the Tulukeesh adherent wishes to take a program offered by DOCS "voluntarily." *Id.*

Based on all the evidence presented, this court finds that defendants' actions did not violate plaintiffs' First Amendment rights.  Directive 4202 is reasonably related to legitimate penological interests.  Defendants have attempted to accommodate plaintiffs but have prevented them from "exercising" their rights only in ways that would be contrary to security concerns, such as allowing them to spar, hiring a martial arts instructor, and allowing them to refuse to be seen naked by anyone who is not Tulukeesh.  Confiscating the Holy Blackness after plaintiff Keesh continued to

---

[30] Plaintiff conceded, however, that part of his religion required him to tell other inmates about Tulukeesh. Keesh Dep. at 217.

solicit other inmates was a reasonable response, given the book's subsequent availability in the Chaplain's Office.  One of defendants' exhibits is a memorandum showing that in June of 2004, other inmates were requesting materials "identified by Allah to participate in his religion." Defendants' Ex. K at p.6.

This memorandum is from defendant Smith to defendant Gorelick and tells defendant Gorelick that he and the Chaplain should "meet with" plaintiff Keesh to tell him to stop the practice of soliciting other inmates.[31]  Defendant Smith stated in the memorandum that plaintiff Keesh should be told to stop this activity *or* he would be charged with misbehavior. *Id.* Defendants gave plaintiff Keesh the chance to comply with the rules prior to charging him with misbehavior.  Defendants have shown that their actions were reasonably related to legitimate penological interests.  Plaintiffs' response that there is *no way* for them to practice their religion other than the way that was specified in plaintiff Keesh's October 2003 letter simply does not satisfy the requirement that plaintiffs show that defendants' actions were "irrational."   Plaintiffs' First Amendment claim must be dismissed.

### B. RUILPA

RUILPA provides that

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person -

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

---

[31] Plaintiff Keesh states that his religion "requires" him to teach others about Tulukeesh.  Thus, this is another instance in which "practicing" plaintiffs' religion results in the violation of facility rules.

42 U.S.C. § 2000cc-1(a).  Under RLUIPA, the plaintiff bears the burden of showing that his

religious exercise has been burdened and that the burden is substantial. *Marria v. Broaddus*, 200 F.

Supp. 2d 280, 297 (S.D.N.Y. 2002)(citing 42 U.S.C. § 2000cc-2(b).  The burden then shifts to the

government to show that the burden furthers a compelling governmental interest *and* that it is the

*least restrictive* means of achieving that interest. *Id.*  The act defines "religious exercise" to

include "any exercise of religion, whether or not compelled by, or central to, a system of religious

belief." 42 U.S.C. § 2000cc-5(7)(A).

     In this case, as stated above, the defendants do ***not*** argue that plaintiffs are not attempting

to exercise a "religious" right and concede that the defendants' conduct "substantially burdens"

that right since Tulukeesh requirements are many and varied, and defendants have refused to

comply with many of them.  The issue in this case under RLUIPA is whether the defendants'

conduct in response to plaintiffs' requests is justified by a compelling state interest or interests or

whether their response is the least restrictive method for achieving those interests.

     RLUIPA was upheld against constitutional challenge in *Cutter v. Wilkinson*, 544 U.S. 709

(2005).  In *Cutter*, however, the Supreme Court also stated that safety and security are

"undisputedly compelling state interests." 544 U.S. at 717.  The court also stated that RLUIPA

permits these compelling state interests to outweigh an inmate's claim to a religious

accommodation, and while the act does adopt the compelling state interest standard, "'context

matters' in the application of that standard." *Id.* at 717, 722-23.  The Supreme Court noted that

supporters of RLUIPA in Congress[32] anticipated that courts would apply this standard "with 'due

---

    [32] Although RLUIPA was enacted in 2000, it appears that these Congressional hearings, cited by
the Supreme Court in *Cutter* were related to RLUIPA's predecessor, the Religious Freedom Restoration
Act of 1993 (RFRA) that was invalidated as it applied to States and their subdivisions by *City of Boerne
v. Flores*, 521 U.S. 507, 532-36 (1997). *See Cutter*, 544 U.S. at 714-17.

deference to the experience and expertise of prison and jail administrators in establishing

necessary regulations and procedures to maintain good order, security and discipline, consistent

with consideration of costs and limited resources.'" *Id.* at 723 (citing Joint Statement S7775

(quoting S. REP. NO.103-111, p.10 1993)).  Lower courts have also held that maintaining security

and preserving order are both compelling governmental interests. *Orafan v. Goord*, 411 F. Supp.

2d 153, 160 (N.D.N.Y.  2006)(citing *Cutter v. Wilkinson*, 544 U.S. at 723 n.11).  Additionally,

fiscal, staffing, and space considerations are part of maintaining security and order. *Id.* (citing

*Marria v. Broaddus*, 2004 U.S. Dist. LEXIS 14829 at *2).

     The defendants in this case allege that there are both concerns for security as well as for the

orderly process by which religions are recognized and accommodated.  It has been held that simply

raising the "specter" of security is not sufficient to outweigh the inmates' interests. *See Spratt v.*

*Rhode Island Dep't of Corrections*, 482 F.3d 33, 38-39 (1st Cir. 2007).  In *Spratt*, the inmate

wished to "preach" to inmates. *Id.* at 35.  He had been ordained as a minister in the Universal Life

Church, and the prison chaplains began allowing plaintiff to preach to inmates during weekly

services. *Id.*  Although there had been no problems with plaintiff's activities for seven years,  the

defendants in *Spratt* suddenly decided that he could no longer engage in his preaching activities.

*Id.* at 35.  The lower court dismissed the action as to claims of Constitutional violations as well as

RLUIPA. *Id.*   Spratt appealed only the denial of the RLUIPA claim. *Id.*

     The defendants' reasoning in *Spratt* included allegations that allowing inmates to be in

actual or perceived leadership could be a threat to security.  *Id.* at 36-37.  Spratt argued that

defendants' response was exaggerated and based on speculation, offering to submit to facility

supervision of his preaching activities. *Id.* at 37.  The First Circuit found under RLUIPA that

Spratt's religious exercise, which included preaching, was substantially burdened and found that

38

the defendants' response was not the least restrictive means of achieving their compelling state interest of security. *Id.* at 39.

The court found that, other than citing one non-relevant case, the defendants in *Spratt* had not met their burden of showing that having inmates in a "leadership" position endangered security, and that defendants had not shown that they had considered and rejected the efficacy of less restrictive measures before adopting the ***blanket ban*** on inmate preaching. *Id.* at 40-41.  In making this decision, however, the court did note that RLUIPA does not require prison administrators to refute "every conceivable option in order to satisfy the least restrictive means prong" of the statutory test. *Id.* at 41 n.11.

This case is distinguishable from *Spratt*, and *Spratt* actually supports defendants' actions in this case.  New York does ***not*** have a "blanket ban" on inmates leading religious classes or services.  DOCS Directive 4202 provides for inmate facilitators to preside over religious classes and services when either the facility chaplain or an outside religious volunteer is not available. Directive No. 4202(C).  This directive further provides that no employee, chaplain, religious volunteer or inmate facilitator shall disparage the doctrines, beliefs, practices, or teachings of another religious faith. *Id.*  Proselytizing is strictly prohibited. *Id.*  Directive 4202 is very lengthy and also governs the possession of religious publications and texts. Directive 4202(G).  However, the Directive ***does*** require that in order to be allowed to conduct ***congregate services***, there must be an approved outside sponsor.

It is certainly reasonable that defendants would want to ensure that inmate organizations are not utilized for improper purposes.  There is a compelling state interest in avoiding the proliferation of gangs in DOCS facilities.  It is also reasonable for defendants to be concerned about plaintiff Keesh's assertion that he, who had once declared himself both Jewish and NOI, had

39

now become the lord and savior of his self-created religion of Tulukeesh.  Yet, notwithstanding this understandable concern and defendants' inability to comply with plaintiff Keesh's demands without violating various prison rules and directives, defendants attempted to accommodate plaintiffs as best they could.

There is certainly a compelling state interest in being able to conduct a strip frisk where appropriate.  Plaintiffs' demand that no one who is not Tulukeesh may see them naked flies in the face of a serious security requirement.  The restrictive diet would be almost impossible to provide, given the specific foods on specific days that plaintiffs must eat.  Plaintiffs argue that their prison records are exemplary, they have never advocated violent actions, they have acted as facilitators for various organizations, and have actually taken some of the DOCS programs that they assert, according to Tulukeesh literature, they do not need.  Plaintiff Keesh submits exhibits showing that he is the Chairman of the Lifers' and Long-termers' Organization, which publishes a very substantial magazine. Plaintiffs' Ex. 111, 150.  They have filed exhibits in support of their "vegan" diet. Dkt. No. 112, 125.[33]

The issue, however, is not plaintiffs' exemplary behavior, which is not challenged by defendants and not disputed by this court.  The fact that plaintiffs may be leaders of other facility organizations is also not determinative.  One of the issues is whether compliance with Directive 4202 is the least restrictive means of protecting defendants' compelling state interests of order and security.  This court finds that it is.  Unlike the defendants in *Spratt*, defendants in this case are *not* arguing that inmates should never lead organizations or religious services.  Defendants argue that **before** they can allow inmates to lead religious services, they must have an outside sponsor, and

---

[33] Although the documents in Docket No. 125 are labeled Exhibits No. 150 and 151, plaintiffs have also labeled other exhibits 150 and 151.  Thus, the court will refer to the documents contained in Docket No. 125 by their docket number rather than by exhibit number.

the inmates may only conduct the classes or services if that sponsor is not available. As stated above, this directive does not prevent plaintiffs from practicing their religion in their cells.

Plaintiffs were given the opportunity to solicit an outside volunteer or sponsor, but they were unable to do so after various attempts. Plaintiffs were also apparently able to contact a radio show host and obtain some "air time" regarding Tulukeesh. Although plaintiffs argue that the Holy Blackness has been confiscated and they can no longer refer to it at will, and therefore, cannot practice their religion in their cells, the book was seized because it became clear to defendants that plaintiff Keesh was continuing to show it to other inmates. This was evidenced by the fact that other inmates were requesting materials identified by plaintiff Keesh. Defendants' Ex. K at p.5.

Plaintiffs argue that other organizations are allowed to have meetings, and if they had just labeled theirs as an "organization" under DOCS Directive 4760, they would not be having these problems. Plaintiffs have clearly misread DOCS Directive 4760. A copy of this directive is attached to plaintiffs' papers as Exhibit 141. In section (II)(D) of the directive, it specifically states that each inmate organization will be under the "direct supervision" of a facility staff person, and that even inmate organizations must be approved. This directive also states that membership in an organization *does not* entitle inmates to *any special privileges* or special work assignments. DOCS Directive 4760(II)(E)(2), (II)(F). All correspondence by organizations must be approved, and they may not transact any business from an outside company or individual. *Id.* 4760(II)(G). This directive also sets forth organized procedures that assist facility officials in making sure that organizations of any kind are not used for improper purpose, so plaintiffs' argument is misplaced.

Plaintiffs simply do not wish to accept *any alternatives* that defendants propose. It appears from their papers that it is either *all or nothing* with respect to their religion, and this court cannot

find that defendants must accept everything requested by plaintiffs without question.  Docket No. 125 contains an affidavit from Susan Levin, a registered dietitian for the Physicians Committee for Responsible Medicine.  In this affidavit, Ms. Levin states that there are many medical advantages to a vegan diet and that whole fruits, vegetables, beans, grains, nuts, and seeds are the optimal components for this "way of eating." *Id.* ¶ 4.  The second document is a letter from Bruce Friedrich, Vice President for People for the Ethical Treatment of Animals (PETA), who states that defendants should be compelled to provide vegan meals to inmates who consider this diet to be an important part of their moral or spiritual beliefs and practices.

While the court does not argue with the possible "benefits" of a vegan diet, it is unclear whether either of these individuals has read plaintiffs' requirements for this diet.  Not only have plaintiffs requested a "vegan" diet, but plaintiff Keesh has decided that this vegan diet does not include soybeans.  Soybeans are not animal products.  They are not dairy products, and there is no indication that certain foods must be eaten on certain days in order to be considered "vegan." Thus, the fact that a vegan diet may be good for plaintiffs does not indicate that DOCS should be compelled to provide them with their unreasonable dietary requests.  The plaintiffs have been given the option to choose items from the general population menu that are meatless, and have been given the opportunity to supplement their diets with items that they have purchased from the commissary.

Thus, this court finds that even though defendants are "substantially burdening" plaintiffs' religion as plaintiff Keesh has developed it, defendants' response is the least restrictive means of furthering the compelling state interests of security ***and*** order.

**5.    Retaliation**

Retaliation for the exercise of a constitutional right is a separate claim from the plaintiffs'

42

substantive First Amendment or statutory RLUIPA claim. *See Graham v. Henderson*, 89 F.2d 75, 79 (2d Cir. 1996). Any action taken by defendants in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Franco v. Kelly*, 854 F.2d 584, 588-90 (2d Cir. 1988). In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiffs must show first, that they engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for adverse action taken against them by defendants. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003)(citing *Gayle v. Gonyea*, 313 F.3d 677 (2d Cir. 2002); *Hendricks v. Coughlin*, 114 F.3d 390 (2d Cir. 1997)). The court must keep in mind that claims of retaliation are "easily fabricated" and thus, plaintiffs must set forth non-conclusory allegations. *Id.* (citing *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002)).

Defendants first argue that retaliation was not mentioned as a separate cause of action in the amended complaint. Although defendants are correct in that assertion, it is clear that plaintiffs have alleged that defendants retaliated against them because they have asserted their right to practice their religion as plaintiff Keesh has defined it. The law is clear that regardless of a specific statement of claim, the court must interpret the amended complaint as raising the strongest arguments that it suggests. *Pantaleon v. Gonzales*, 2007 U.S. App. LEXIS 21174, *2 (2d Cir. Sept. 5, 2007)(citing *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006)). Thus, the court will interpret plaintiffs' complaint as raising a retaliation claim.

Plaintiff seem to argue that they have been subjected to cell searches and disciplinary actions in retaliation for the exercise of their First Amendment rights.[34] Cell searches are a routine

---

[34] In plaintiffs' recent submissions, they continue to include incidents that occurred long after the filing of their amended complaint even though plaintiffs' most recent motion to amend was denied. (Dkt. Nos. 89, 90 (reconsideration)).

occurrence in prison, and no inmate has any expectation of privacy in his cell, particularly when the search is related to prison security. *Hudson v. Palmer*, 468 U.S. 517 (1984).  In *Willis v. Artuz*, the Second Circuit cited the holding in *Hudson*, stating that "'society is not prepared to recognize as legitimate any subjective expectation of privacy that a [convict] may have in his prison cell.'" *Willis v. Artuz*, 301 F.3d 65, 69 (2d Cir. 2002)(quoting *Hudson*, 468 U.S. at 526).

With the above legal standard in mind, random searches are completely appropriate.  The court first notes that plaintiff Keesh complained about the seizure of the Holy Blackness in December of 2003. AC, Ex. 11.  It is clear from plaintiff Keesh's letter that the book was subsequently returned to him. *Id.*  On December 5, 2003, defendant Smith wrote a memorandum to plaintiff Keesh stating that the book had been seized "during a routine cell search and copied for review because staff thought the symbols on the cover were that of an unauthorized organization." AC, Ex. 12.  Defendant Smith further stated that the staff had no way of knowing that the book had already been reviewed by other prison officials.

Plaintiffs make many conclusory allegations of retaliation in their amended complaint. Plaintiff Keesh states that the "prison authorities" informed him that the State court would "charge him a filing fee to keep him from having access to the Court and that the Court was part of a scheme with them to deprive Tulukeesh followers of a liberty interest." AC ¶ 38.  In March of 2004, plaintiff Keesh wrote a letter to defendant Pataki, claiming that plaintiff Keesh was being kept out of the Family Reunion Program because of his attempt to practice his religion. AC ¶ 53, Ex. 23.  On May 25, 2004, plaintiff Keesh wrote another letter with an affidavit attached to defendant Pataki, claiming that prison officials were engaged in a conspiracy that was "designed to set [plaintiff ] up with a fabricated misbehavior report. AC ¶ 63, Ex. 30, 31.  The affidavit also appears to have been filed in plaintiff Keesh's state court action.

The first misbehavior report that plaintiff Keesh mentions after his May 25, 2004 letter was not filed until July 17, 2004, in which he was accused of harassing a DOCS employee by writing directly to his home. AC ¶ 68, Ex. 35.  The misbehavior report was dismissed after a hearing in which there was conflicting evidence regarding the letter in question.  None of the above claims made by plaintiff Keesh can survive defendants' motion for summary judgment and do not support summary judgment in their favor.  Plaintiff Keesh's allegations in May of 2004 that he was ***going to be*** "set up" do not show that the motivation for the misbehavior report that was filed on July 17, 2004 was in retaliation for the practice of religion or his legal action in state court.  Because there is no nexus between the allegedly adverse action and the assertion of plaintiffs' constitutional rights, there is no claim for retaliation established.

Plaintiffs' next claim of retaliation begins with a cell search, dated July 23, 2004. AC ¶ 76, Ex. 38.[35]  Plaintiffs state that a bag of materials was taken from each of their cells, containing five copies of the Holy Blackness from plaintiff Jova; two copies of Holy Blackness books and manuscripts from plaintiff Keesh; Keesh study guides; Tulukeesh calendars (with holiday schedules); materials describing their religious beliefs; letters to the media and self-publishing company; books and papers on the Swahili language; letters from family and friends and legal papers.

Plaintiffs were both given misbehavior reports, relating to the seizure of materials. AC   ¶¶ 79, 80.  Defendants have submitted exhibits showing that on June 22, 2004, defendant Smith wrote a memorandum to Deputy Superintendent John Maly, stating that cell searches be initiated for four inmates, two of which were the plaintiffs in this case. Defendants' Ex. K at p.1.  Defendant Smith

---

[35] Exhibit 38 is a copy of the contraband receipts for both plaintiffs.

does state in his memorandum that he is concerned about the potential growth of Tulukeesh because although the inmates cited religious practices, the prison officials had no way of determining the intent of these individuals.  There is a hand written note at the bottom of the page, dated July 23, 2004 to "Lt Blades."  The note states that the searches should be done as soon as possible, and that staff should take care to ascertain if there is any unauthorized organizational material in the cells.  *Id.*

It is clear that the reason for the search was not to retaliate against plaintiffs for the exercise of their religious rights, but rather to determine whether they were engaging in "unauthorized organization."  Plaintiffs had been told that they were ***not*** allowed to show their materials to other inmates or to attempt to influence others to join their religion.  Based upon the information that defendant Smith received, it was clear that plaintiffs were not abiding by these instructions.  Thus, defendant Smith ordered the cell search.  Plaintiffs themselves acknowledge that they had multiple copies of the Holy Blackness in their cells as well as unauthorized letters to a self-publishing company.

Notwithstanding the fact that plaintiffs were violating some[36] of the facility rules, both plaintiffs received ***deferred and suspended sentences***.  They were counseled to stop attempting to involve others in their religion.  Although plaintiffs argue that this was retaliation for the exercise of their right to practice their religion, as stated above, the restriction of the practice of Tulukeesh to the plaintiffs' individual cells was reasonable.  The fact that plaintiff Jova had ***five copies*** of the Holy Blackness in his cell is certainly evidence that he may have been meaning to distribute them to others.  Therefore, the violation of this instruction did constitute misbehavior even though it was

---

[36] As stated above plaintiff Keesh brought an Article 78 proceeding which resulted in the reversal of the last remaining charge from the July 29, 2004 hearing.

46

related to plaintiffs' alleged religious practice.  Thus, defendants were justified in both searching the plaintiffs' cells and giving them misbehavior reports for their actions.  The fact that plaintiffs received **_suspended sentences_** is further evidence that there was no retaliatory motive to defendants' actions.

Plaintiff Keesh filed a grievance regarding this retaliation, and it was explained to him in the response to the appeal of his grievance that the cell search was "part of an investigation into his ongoing attempts to recruit followers of his self-developed religion, despite clear direction not to proselytize." AC Ex. 70 at pp.2-3.  Plaintiff Keesh alleges that his cell was searched again on December 30, 2004, and a notebook was confiscated. AC ¶ 130, Ex. 72.  It appears from the exhibits that the search actually took place on December 15, 2004.  Plaintiff Keesh again claimed that the search was part of a series of retaliatory actions by prison officials, and he filed a grievance regarding the search. AC, Ex. 73.  The grievance was denied because the search was one of the "daily random searches." _Id._ at p.3.  The decision on the grievance appeal also stated that the possession of the notebook in question[37] was investigated, and no action was taken against plaintiff.

The next search of plaintiff Keesh's cell took place on February 28, 2005, but the materials confiscated were returned to plaintiff Keesh. AC ¶¶ 142-44.  Although plaintiff states that he was charged on March 3, 2005 with unauthorized correspondence, he never mentions how this charge was related to retaliation, and there is no indication of the disposition of this charge.  A review of the documents submitted by plaintiffs with the complaint indicate that the unauthorized correspondence was written to a female, discussing his "founded" religion, but also stating that he

---

[37] Apparently, this notebook was a "school book."  It does not appear that the notebook was related to plaintiff Keesh's religion.

had not been able to advertise his book and that he wished to "make a connection" with her. AC, Ex. 79. The female apparently complained to the facility about plaintiff Keesh's letter. Once again, there is no evidence that either the search or the misbehavior report were in any way in retaliation for plaintiff Keesh's exercise of his constitutional rights.

Finally, the court would point out that plaintiff Jova testified at his deposition that *he* had no claims of retaliation in the amended complaint. Jova Dep. at 137-39. Plaintiff Jova also admitted that prior to this action, he never had problems with any of the defendants. *Id.* at 139. The court would also point out that in plaintiff Keesh's affidavit to the state court, dated May 25, 2004, he claimed that defendants had retaliated against him by "compelling" him to be interviewed by the Mental Health Unit.[38] AC, Ex. 31 at p.2. However, during his deposition, plaintiff stated that *he* had requested mental health services at *various* facilities, and in fact claimed at one point that he was denied these services and filed a grievance in relation to that denial. Keesh Dep. at 211-13. Thus, this allegation cannot be a basis for a claim of retaliation.

After a careful review of the record, this court finds that plaintiffs claims of retaliation are illusory, and that plaintiff Jova conceded at his deposition that no one personally retaliated against him. The cell searches and the misbehavior reports were related to the fact that plaintiffs continued to defy defendants by attempting to create a following for plaintiff Keesh's religion after being told not to do so. Thus, although the materials would have been authorized for possession by Keesh and Jova individually, the fact that the searches and other information revealed that they were using their authorized materials for unauthorized purposes justified defendants' actions. Therefore, to the extent that the complaint *can be interpreted* as raising a retaliation claim, it must

---

[38] This allegation of retaliation does not appear in the complaint itself, but the court would merely note its existence since it is inconsistent with plaintiff Keesh's deposition testimony.

be dismissed.

**6.     Equal Protection**

In order to state an equal protection violation, plaintiffs must show that they were selectively treated as compared to ***similarly situated*** inmates, and that their selective treatment was motivated by an impermissible consideration such as membership in a suspect class, retaliation for the exercise of a constitutional right, or malicious or bad faith intent to injure. *Birmingham v. Ogden*, 70 F. Supp. 2d 353, 371 (S.D.N.Y. 1999).

In this case, plaintiffs allege that defendants have violated their right to equal protection because defendants allow "other religious groups" to practice their religions, but have deprived plaintiffs of this ability.  Plaintiffs' problem is that they and their religion are not "similarly situated" to other religions that have complied with Directive 4202, have been recognized by DOCS, and have a free-world sponsor.  Plaintiffs have not shown that there is any other religion, created by an inmate for which that inmate is the teacher and savior that has been accorded the treatment that plaintiffs request.  Since plaintiffs cannot show that they are similarly situated to inmates practicing other religions, they cannot sustain an equal protection claim.

**7.     Eighth Amendment**

In order to establish an Eighth Amendment violation, plaintiff must show that the deprivation was objectively, sufficiently serious to deprive plaintiff of the minimal civilized measure of life's necessities, and a sufficiently culpable state of mind on the part of defendants. *Id.* That state of mind is satisfied if defendants have shown deliberate indifference to plaintiffs' health or safety. *Id.* (citations omitted).  The Eighth Amendment requires that prison officials serve inmates "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well-being of the inmates who consume it."

49

Plaintiffs claim that because they have been unable to eat their Tulukeesh diet, their health has suffered, and they are unable to concentrate. However, at his deposition, plaintiff Jova stated that his only injuries were "stress" and not being able to eat his proper diet. *Id.* at 139-40. Plaintiff Jova also testified that he was five feet eight or nine inches tall and weighed 175 pounds. *Id.* at 140. When asked whether he believed that he was "underweight," he stated that he was not "starving," rather he was not "eating right." *Id.* at 140-41. A review of the menus offered to general population inmates as well as the religious alternative menus show that plaintiffs have been offered many vegetarian options. They have set forth no reason for the requirement that they eat specific foods on specific days, and they have also supplemented their diet with many purchases from the commissary.

Plaintiffs cite very few instances, and plaintiff Jova cites **no** instances in which they have asked for medical attention for any alleged nutritional deficiencies.[39] There is absolutely no evidence that defendants have been deliberately indifferent to the plaintiffs' health or safety in failing to give them the specific diet that they request.

## CONCLUSION

Based on a thorough review of a very extensive record, this court finds that DOCS Directive No. 4202 is constitutional in its requirement that a religion within the prison have an outside sponsor in order to be recognized and approved for congregate services and classes. The Directive also does not violate RLUIPA because there is a compelling governmental interest in maintaining procedures for the recognition of different religions as well as accommodating various

---

[39] Plaintiff Keesh filed a grievance in May of **2005** complaining that he had lost a great deal of weight and was not getting a nutritionally adequate diet. (Dkt. No. 117, Ex. 146). The response to plaintiff's grievance stated that he was currently being monitored **weekly** by the medical staff regarding his "self-induced" weight loss. *Id.* Ex. 146 at pp.2-3.

religious requests, and Directive 4202 is the least restrictive alternative means of furthering that interest.  Plaintiffs have misread the section of the directive that allows inmates to preside over services or classes in the absence of their outside sponsor or of the facility chaplain.

The court also finds that to the extent that plaintiffs' complaint may allege retaliation, there is no question of fact and no evidence that defendants were retaliating against plaintiffs for the exercise of their constitutional rights.  Rather, defendants were enforcing their legitimate orders that plaintiffs stop attempting to obtain followers for Tulukeesh from the inmate population.  Until it appeared that they had violated that order, plaintiffs had been able to have the Holy Blackness in their cells.  The books were removed from plaintiffs' cells and kept in the chaplain's office only *after* it was determined that plaintiffs were attempting to obtain more followers in violation of DOCS directives.

This court also finds that because plaintiffs are *not* similarly situated to other religious groups, there has been no denial of Equal Protection.  Finally, there is absolutely no evidence or question of fact raised regarding plaintiffs' health, and they cannot sustain an Eighth Amendment claim.

**WHEREFORE**, based on the above, it is

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 101) is **GRANTED** and the amended complaint **DISMISSED IN ITS ENTIRETY**, and it is further

**ORDERED** that plaintiffs' motion for summary judgment (Dkt. No. 112) is **DENIED**.

Dated: September 25, 2007

Norman A. Mordue
Chief United States District Court Judge

51