UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

TYHEEM KEESH; JESUS JOVA,

                                        Plaintiffs,

                    v.                                        9:04-CV-779
                                                              (NAM/ATB)

JOSEPH T. SMITH; EVAN GORELICK,
*et al.*,

                                        Defendants.

_____

TYHEEM KEESH
Plaintiff pro se
JESUS JOVA
Plaintiff pro se

RICHARD LOMBARDO
Asst. Attorney General for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

This matter has been referred to me for Report-Recommendation by the

Honorable Norman A. Mordue, Chief United States District Judge, pursuant to 28

U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).[1]

## I.  RELEVANT FACTS

The facts in this case involve plaintiffs' desire to practice their chosen religion.

Plaintiff Keesh wrote a letter to defendants Goord and Smith on October 14, 2003,

advising them of his desire to practice the "Tulukeesh" religion. (Dkt. No. 126 at 3)

_____

[1] The case was originally referred to the Honorable Gustave J. Di Bianco and was
assigned to me upon Judge Di Bianco's retirement on January 4, 2010. (Dkt. No. 154).

(citing Amended Complaint (AC) at ¶ 1 and Ex. 1. (Dkt. No. 26)).  Plaintiff Keesh's letter also sought to establish Tulukeesh as an authorized religion within the Department of Correctional Services (DOCS). *Id.* (citing Ex. 1).  According to plaintiff Keesh, "Tulukeesh" is the "Religion of Zee Keesh (The Creator)," and plaintiff identified himself as the "Savior and Teacher" of Tulukeesh. *Id.* at 4 (citing Ex. 1 at pp.1, 3).  Plaintiff Keesh also stated that he is the "Leader and Founder" of Tulukeesh. *Id.* (citing Mans Aff. Ex. 19, Keesh Aff. ¶ 3).

The letter further outlined many of the required practices and observances of Tulukeesh. *Id.* (citing AC, Ex. 1).  These practices included adherence to specific dietary laws, observation of holy days and fast days, possession of religious items and literature, hygiene requirements, exercise, and health  requirements. *Id.*(citing Ex. 1 at pp.1-6).  The dietary laws included eating a vegan diet, without soybeans, prepared only by another follower of Tulukeesh. *Id.* (citing Ex. 1at pp.1-2).  Additionally, certain foods had to be eaten on certain days of the week. *Id.* (citing Ex. 1 at p.2).  Plaintiff Keesh carefully described which foods were to be eaten on which days. *Id.* (citing Ex. 1 at p.2).

Although not relevant to this report, the Tulukeesh adherents are required to have a prayer rug and mat; a head crown; a flag; a library of at least seventy books; and be professionally trained in martial arts. *Id.* at 4 (citing Ex. 1 at 4-5).  Tulukeesh followers were also required to have access to both a radio and a cassette player. *Id.* The Tulukeesh holy days included the birthdays of plaintiff Keesh; Dr. Martin Luther King; Bob Marley; and Judy Keesh (plaintiff's mother). *Id.* (citing Ex. 1 at 3).  The

2

Holy Book of Tulukeesh was written by plaintiff Keesh and is entitled the "Holy Blackness." *Id.* at 5 (citing Def.s' Ex. G).

Defendant Smith responded to plaintiff's letter, by Memorandum dated October 17, 2007, stating that although DOCS took no position in acknowledging any religion within the inmate population, DOCS supported the "'concept of religious liberty.'" *Id.* at 5 (citing AC, Ex. 2). Defendant Smith stated that plaintiff Keesh could practice his[2] religion in the privacy of his own cell, "'within the parameters established by current facility operational procedures.'" *Id.* Plaintiff was also told that, prior to any further action by DOCS, it would be helpful to have the Holy Blackness reviewed by the Coordinating Chaplain, Imam Rashid. *Id.*

In a letter dated November 3, 2003, defendant Nuttal told plaintiff Keesh that if he wished to change his religious registration, he would have to make that request through the Coordinating Chaplain. *Id.* at 7 (citing Ex. 6). Plaintiff Keesh later applied to change his religious affiliation, but because DOCS did not formally recognize Tulukeesh, in mid-November of 2003, plaintiff Keesh's registration was changed from NOI to "'other'" according to DOCS records. *Id.* at 7 (citing Ex. 10). Plaintiff Keesh was denied the ability to have "congregate" services because the DOCS regulations required the involvement of an "outside" member of the clergy, together with an approved inmate acting as a facilitator. *Id.* at 6-7 (citing Ex. 4). In response to a grievance, plaintiff was told that he was free to encourage an outside

---

[2] Defendant Smith also pointed out that, at the time, plaintiff Keesh's religion was listed in DOCS records as "Nation of Islam" (NOI). (Dkt. No. 126 at 5).

"clergyperson" to contact the Coordinating Chaplain and apply to become a registered religious volunteer, pursuant to DOCS Directive No. 4202(C). *Id.* at 8. Plaintiff Jova also complained to DOCS officials that he was being denied the right to practice Tulukeesh. *Id.* at 9 (citing Ex. 18).

Chief Judge Mordue's opinion describes the letters written, and grievances filed, by plaintiffs, challenging the alleged violations of their rights under the First Amendment and the Religious Land Use and Institutionalized Persons Act (RLIUPA), 42 U.S.C. § 2000cc *et seq*. *Id.* at 7-9, 16-17. Plaintiff's cells were searched, and they were charged with various disciplinary offenses, based upon their attempts to practice their religion as they saw fit. *Id.* at 11-15. Plaintiff Keesh had the Holy Blackness published by an outside publisher and was disciplined for having done so. *Id.* at 14. On September 23, 2004, the Facility Media Review Committee decided that certain pages of the Holy Blackness should be removed because they might "incite disobedience." *Id.* at 17 (citing Ex. 72-73). Ultimately, defendant Nuttal advised plaintiff Keesh that the Holy Blackness would be kept in the facility Chaplain's possession, but that plaintiff would have reasonable access to his book upon request. *Id.* at 18 (citing Ex. 75).

Plaintiff Keesh brought an Article 78 Proceeding in New York State Supreme Court in June of 2004, a month before bringing this action. In the Article 78 papers, he raised both constitutional claims under the First Amendment, as well as claims

4

under RLUIPA.[3]  In that case, plaintiff challenged the denial of a grievance "seeking special accommodations to practice 'Tulukeesh,' a religion which he created." *See Allah v. Goord*, 26 A.D.3d 608, 810 N.Y.S.2d 235 (3d Dep't 2006).  Plaintiff's claims were denied on the merits, both by Justice E. Michael Kavanaugh and on appeal to the Appellate Division, Third Department. *Id.*  The Appellate Division held that the respondent had carefully considered plaintiff's requests for a special dietary menu, observance of "self-created" religious holidays, and opportunities for congregate services. *Id.* at 609.  The New York State courts found that the partial denial of plaintiff's grievance was neither arbitrary, nor capricious, and that the response was "'consistent with and served to further institutional objectives of confinement, order and safety.'"[4] *Id.*

## II.   PROCEDURAL HISTORY

Plaintiffs filed this action on July 6, 2004 and amended their complaint on March 10, 2005. (Dkt. Nos. 1, 26).  The amended complaint raised claims based on the First and Fourteenth Amendments; RLUIPA; New York State Regulations; and

---

[3]  Although defendants argued that plaintiffs' claims should be barred by collateral estoppel, Chief Judge Mordue correctly found that neither Judge Kavenaugh, nor the Appellate Division mentioned the constitution, RLUIPA, or their respective standards in their decisions. (Dkt. No. 166 at 20).  Judge Mordue found that plaintiff Keesh's RLIUPA claims were not "necessarily decided" in the state court, and it was questionable whether plaintiff's constitutional claims were "necessarily decided" in the state courts, thus, preventing the application of collateral estoppel. *Id.* at 21-22.

[4]  Plaintiff Keesh later brought a petition under Article 78, challenging the result of a disciplinary report that charged him with solicitation regarding the printing of the Holy Blackness. *See Keesh v. Goord*, 26 A.D.2d 560, 807 N.Y.S.2d 733 (3d Dep't 2006).  The Appellate Division ruled that because the actual correspondence with the publishing company was not in the record, there was insufficient evidence to sustain the disciplinary determination. *Id.* at 561.  The determination was, therefore, reversed. *Id.*

Department of Correctional Services (DOCS) Directives. (Am. Compl.; Dkt. No. 26).
The basis of plaintiffs' allegations was that defendants violated their rights to freely
practice their chosen religion, Tulukeesh.  On September 26, 2007, Chief Judge
Mordue granted defendants' motion for summary judgment and dismissed the action
in its entirety.[5] (Dkt. No. 126).

Plaintiffs appealed the dismissal to the Second Circuit Court of Appeals, and on
September 28, 2009,[6] the Second Circuit affirmed in part and vacated and remanded in
part. (Dkt. No. 153).  The Second Circuit affirmed the dismissal of all of plaintiffs'
claims except plaintiffs' RLUIPA claim **only** with respect to their religiously-
mandated diet.  In vacating and remanding that single issue to the District Court, the
Second Circuit stated that:

> Although the record indicates that the Defendants were
> perfectly capable of providing a vegetarian entree on most
> days of the week, and may in fact have provided vegan
> entrees on occasion, there is no indication that the
> Defendants discussed, let alone demonstrated why they
> cannot provide an entirely vegetarian menu to inmates who
> request it.  We therefore conclude that the Defendants did
> not demonstrate that the religious/meatless alternative menu
> was the least restrictive means of furthering their compelling
> administrative interests.

*Jova v. Smith*, 582 F.3d 410, 417 (2d Cir. 2009).  The remand was very limited, and
the court further stated that:

---

[5] At the same time, Chief Judge Mordue denied plaintiffs' cross-motion for summary
judgment. (Dkt. No. 126 at 51).

[6] The mandate was issued November 30, 2009 and filed with this court on December 10,
2009. (Dkt. No. 153).

the case is remanded for consideration of whether there is a
less restrictive substitute (including, but not limited to, an
entirely vegetarian diet) for the current religious alternative
menu.[]

*Id.* (footnote omitted).  The Second Circuit also left it to the District Court to consider

any issues of qualified immunity because, although defendants had raised it, the

district court did not consider its potential application.[7]  *Id.* at 418 n.4.  The dismissal

of all plaintiffs' other claims was affirmed. *Id.* at 418.

On April 16, 2010, Chief Judge Mordue issued an order, in accordance with the

Second Circuit's remand, affording the parties leave to file renewed motions for

summary judgment, addressing the remaining RLUIPA claim and qualified immunity.

(Dkt. No. 155).  On July 23, 2010, both plaintiffs and defendants filed their renewed

motions for summary judgment. (Dkt. Nos. 167, 168).  Defendants argue that the

Religious Alternative Menu (RAM) is the least restrictive alternative to giving

plaintiffs the specific foods they request for their religiously mandated diet and to

affording a completely "vegetarian" diet to those inmates who request it.  Defendants

also argue that RLUIPA does not allow for monetary damages against them in their

official capacities, they were not personally involved in their individual capacities,

and in any event they would be entitled to qualified immunity.

Plaintiffs argue that summary judgment should be granted in their favor because

DOCS can easily provide them with the diet they request with "no administrative

---

[7] Discussion of qualified immunity was not necessary because the District Court found no
constitutional or statutory violation upon which to base the determination of qualified immunity.

burden." (Dkt. No. 167-2 at 21).  Both plaintiffs and defendants have responded to each other's motions for summary judgment. (Dkt. Nos. 185, 188).  Defendants filed a reply, and each plaintiff filed a reply.[8] (Dkt. Nos. 190, 191, 192).

For the following reasons, this court agrees with defendants and finds that the RAM is the least restrictive alternative, and that defendants did not violate RLUIPA in refusing to give plaintiffs the specific menus they requested.  Further, this court finds that defendants were not personally involved in denying plaintiff's menu choices, and that in any event, they would be entitled to qualified immunity with respect to damages in their individual capacities.  Because the court finds that defendants did not violate RLUIPA, the court need not decide the issue of whether plaintiffs would be entitled to damages against defendants in their official capacities  That issue is currently pending before the Supreme Court.[9] *See Sossamon v. Texas*, 560 F.3d 316 (5th Cir. 2009), *cert. granted*, ___ U.S. ___, 130 S. Ct. 3319 (U.S. May 24, 2010).

---

[8] On January 18, 2011, plaintiffs filed a "Motion to Vacate Order on Motion for Summary Judgment," seeking to have Chief Judge Mordue "vacate" his September 25, 2007 judgment based upon what plaintiffs perceive to be a fraud perpetrated upon the court by defendants. (Dkt. No. 193-94).  The court would point out that plaintiffs have already made one motion to vacate Chief Judge Mordue's Order. (Dkt. No. 130).  This motion, filed October 9, 2007, also claimed mistake of facts and fraud by defendants. *Id.*  The motion was denied on May 29, 2008. (Dkt. No. 138).  Plaintiffs have now advanced a different reason that they claim defendants misled the court.  This new reason relates to congregate services. (Dkt. No. 193).  This new allegation has no bearing on the issue upon which the Second Circuit's remand was based, thus, this court will continue to address the dietary claim and allow Chief Judge Mordue to address plaintiffs' most recent motion to vacate.

[9] In *Hall v. Epke*, No. 09-4492, 2010 WL 3996211 at *3 (2d Cir. Oct. 13, 2010), the Second Circuit reserved decision on a RLUIPA claim, pending the resolution of the question of whether an individual may sue a state or state official in his official capacity for money damages under RLUIPA.  Plaintiff in *Hall* was seeking only money damages, whereas the plaintiffs in this case are seeking both injunctive and monetary relief.

## III.   SUMMARY JUDGMENT

### A.   Legal Standard

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact.  FED. R. CIV. P. 56[10]; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citations omitted). Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion.  *Id*.  However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); FED. R. CIV. P. 56 (c)(1)(A).  Where the nonmovant bears the burden of proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to evidence that negates the nonmovant's claims or (2) identifying those

---

[10] Rule 56 was extensively amended, effective December 1, 2010.  As the Advisory Committee Notes indicate, "the standard for granting summary judgment remains unchanged."  The revised rule explicitly adopts procedures relating to summary judgment motions "consistent with those already used in many courts."

portions of the nonmovant's evidence that demonstrate the absence of a genuine issue of material fact. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006) (citing *Celotex Corp.*, 477 U.S. at 323); FED. R. CIV. P. 56 (c)(1). The second method requires the movant to identify evidentiary insufficiency, not merely to deny the opponent's pleadings. *Id*.

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id*. "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment." *Salahuddin v. Coughlin*, 674 F. Supp. 1048, 1052 (S.D.N.Y. 1987) (citation omitted). A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

## IV.   RLUIPA

### A.   Legal Standard

RUILPA provides that

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person -

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental
interest.

42 U.S.C. § 2000cc-1(a).  Under RLUIPA, the plaintiffs bear the burden of showing
that their religious exercise has been burdened and that the burden is substantial.
*Marria v. Broaddus*, 200 F. Supp. 2d 280, 297 (S.D.N.Y. 2002)(citing 42 U.S.C.
§ 2000cc-2(b).  The burden then shifts to the government to show that the burden
furthers a compelling governmental interest ***and*** that it is the ***least restrictive*** means of
achieving that interest. *Id.*  The act defines "religious exercise" to include "any
exercise of religion, whether or not compelled by, or central to, a system of religious
belief." 42 U.S.C. § 2000cc-5(7)(A).

### B.    Application

As stated by Chief Judge Mordue in his order, for purposes of their original
motion, the defendants conceded that plaintiffs were engaging in a "religious
exercise" and that the defendants' conduct substantially burdened that exercise. (Dkt.
No. 126 at 37).  The Second Circuit held that "the district court properly found that the
Defendants' interests were compelling." *Jova v. Smith*, 582 F.3d at 416.  The relevant
issue now, only with respect to plaintiffs' dietary requirements, is whether defendants'
response to plaintiffs' request for a particular diet is the least restrictive method for
achieving their compelling state interests. *Id.* at 417.

In support of their motion for summary judgment, defendants have submitted
the declaration of Elizabeth Culkin, the Assistant Director of Nutritional Services for
DOCS. (Dkt. No. 168-1; Culkin Decl. ¶ 1).  Ms. Culkin has a Bachelor of Science

Degree in food and nutrition and is a Registered Dietitian with the American Dietetic Association. (Culkin Decl. ¶¶ 2, 4).  She began working for DOCS in 1984 as an Associate Nutritionist, and in 1985, she was promoted to her current position of Assistant Director of the Office of Nutritional Services. (Culkin Decl. ¶¶ 5-6).  As the Assistant Director, Ms. Culkin is responsible for providing "guidance and direction" with respect to DOCS's nutrition policies and procedures. (Culkin Decl. ¶ 7).

The Office of Nutritional Services is under the supervision of the DOCS Deputy Commissioner of Administration. (Culkin Decl. ¶ 8).  Ms. Culkin's office is responsible for providing "all food services" to DOCS inmates and for the development and implementation of both the "general confinement menu" and the "religious alternative menu" (RAM). *Id.*  Ms. Culkin states that there are approximately 63 "general confinement correctional facilities within DOCS, which house approximately 55,000 inmates." (Culkin Decl. ¶ 9).  "General confinement correctional facilities" are "all correctional facilities maintained by DOCS with the exception of shock facilities and camps." *Id.* n.1.  Each general confinement facility serves the inmates breakfast, lunch, and dinner as set forth in a "state-wide menu," prepared by Ms. Culkin's office ("the general confinement menu"). (Culkin Decl. ¶ 10).  Absent an emergency, an individual facility does not have the authority to change or deviate from the general confinement menu without the approval of the Office of Nutritional Services. (Culkin Decl. ¶ 11).

In her declaration, Ms. Culkin states that in developing the menus for DOCS facilities, the Office of Nutritional Services tries to provide the inmates with a variety

12

of nutritious and palatable meals at a reasonable cost to the taxpayers. (Culkin Decl.

¶ 12).  Each meal in the general confinement menu contains an entree; side dishes,

including potatoes, rice, cooked vegetables, and salad; and a beverage. (Culkin Decl.

¶ 13).  Lunch and dinner also include dessert. *Id.*  The meals are served to the general

population inmates by mess hall workers under the supervision of civilian cooks and

security staff. (Culkin Decl. ¶ 14).  Inmates in general population get their meals by

picking up a tray and proceeding through a mess hall line, while inmates who are in

disciplinary housing, either in a special housing unit or on keeplock, get their meals

delivered to their cells by inmate porters or security staff. (Culkin Decl. ¶¶ 14-15).

The RAM was instituted after the Office of Nutritional Services began to

consider "how best to accommodate as many of the dietary preferences of the inmate

population as possible." (Culkin Decl. ¶ 16).  Ms. Culkin states that the main issues

that were considered were inmates who (1) claimed to have food allergies; (2) those

who had religious objections to eating certain foods; and (3) were vegetarians. *Id.*  The

inmate population contains vegetarians "of varying degrees." (Culkin Decl. ¶ 17).  Ms.

Culkin states that

> Many inmates do not eat red meat or pork, but do eat fish
> and poultry.  Some inmates are true vegetarians, who do not
> eat any animal flesh or eggs.  A very small minority of
> inmates are vegans, who do not consume either animal flesh
> or any animal products, such as eggs, dairy products, ***honey***,
> or lard.

(Culkin Decl. ¶ 17) (emphasis added).

Ms. Culkin then states that in order to consume sufficient amounts of protein to

13

maintain health, vegetarians usually substitute eggs; cheese; and legumes, such as peas, beans, lentils, and soy for meat. (Culkin Decl. ¶ 18).  Because vegans do not eat dairy products, including eggs and cheese, they rely upon legumes such as peas, beans, lentils, and soy for protein. *Id.*  Soy products, the "most popular" substitutes for meat include entrees and side dishes made from soy, such as soy patties, casseroles, and soy milk. *Id.*

In 1993, the Office of Nutritional Services determined that the best way to meet the varying dietary preferences of the inmate population was to add a nutritionally adequate alternative entree to the general confinement menu for every meal that contains a meat entree. (Culkin Decl. ¶ 19).  This alternative entree is referred to as the RAM. *Id.*  Ms. Culkin explains that the RAM is not a separate "menu," but merely an alternative entree added to the general confinement menu. *Id.* n.3.  DOCS began testing the RAM in 1994, and it has been in use in all the general confinement facilities since 1996. *Id.*  The RAM was designed, not only for those with religious objections to eating certain foods, but also those who have food allergies and those who are vegetarians. *Id.*  Inmates may choose this alternative entree without stating any reason, religious or otherwise, for doing so. *Id.*  Absent an emergency, the facility administration has no authority to deviate from the RAM without prior approval of Ms. Culkin's office. *Id.*

Ms. Culkin has submitted for the court's review, a copy of the weekly general confinement menus for the period from September 29, 2003 to the present. (Defs.' Ex. O).  The lunch and dinner alternative entree is listed with an asterisk. (Culkin Decl.

14

¶ 20).  No alternative entree is listed for breakfast because breakfast does not include a meat entree. *Id.*  In order to implement the RAM, each facility was required to determine how many alternative entrees would be required each day and to store, prepare, and serve the alternative entree. (Culkin Decl. ¶ 21).  Service of the alternative entree requires additional supervision by civilian and security staff to ensure that each inmate receives only one entree (alternative or regular). *Id.*

General confinement facilities that contain a "main mess-hall" will permit general population inmates to choose either the regular or the alternative entree at a serving line. (Culkin Decl. ¶ 22).  Other facilities, such as Shawangunk, have "satellite feeding areas" in each housing unit. *Id.*  Those facilities require inmates to submit a request to be placed on a list of inmates who wish to receive the alternative entree. *Id.* Inmates who are in SHU or in keeplock also must submit a request for an alternative entree. *Id.*

A review of Exhibit O in conjunction with Ms. Culkin's declaration shows that for each lunch or dinner that includes a meat entree, an alternative entree is available. (Culkin Decl. ¶ 23).  When the lunch or dinner does not include a meat entree, no alternative is available because the entree is already meatless. *Id.*  These entrees, served on the average twice per week, include pizza, stuffed shells, macaroni and cheese, ravioli, and lasagna. *Id.*  Ms. Culkin points out that in a seven-day cycle, inmates are served 21 meals, and of these 21 meals, nine of the main entrees (seven breakfasts and two lunches/dinners) are meatless. (Culkin Decl. ¶ 24).

For the remaining twelve meals, an alternative is offered (the RAM). (Culkin

Decl. ¶ 26).  Ms. Culkin states that of these twelve remaining meals, approximately ten are meatless. *Id.*  The meatless alternatives, however, are generally soy products, such as meatless chili; sloppy joe, and casseroles containing beans; eggs; or cheese. *Id.*  Ms. Culkin states that because most vegetarians do consume eggs and other dairy products, it was determined that eggs and cheese would be included in the alternative entrees, particularly because they are an excellent source of protein. *Id.*  However, Ms. Culkin states that of the ten meatless alternative entrees that appear during a weekly cycle, on average, seven do not contain eggs or dairy products. (Culkin Decl. ¶ 26 n.5).  The other two entrees are either fish or chicken patties. (Culkin Decl. ¶ 26).  Of the 21 meals fed to inmates in one week, 19 meals include a meatless (vegetarian) entree. (Culkin Decl. ¶ 27).

Ms. Culkin states specifically that in developing and implementing the RAM menu, DOCS did consider making every alternative entree meatless, but determined not to do so because the purpose of the alternative entree program was to accommodate vegetarians, inmates who have religious objections to eating certain foods, and inmates who have food allergies. (Culkin Decl. ¶ 28).  Ms. Culkin states that to fully accommodate the dietary preferences of each of the approximately 55,000 inmates in DOCS would pose an unreasonable financial burden on the taxpayers in New York and an impossible administrative burden on DOCS. *Id.*

Ms. Culkin states that the Office of Nutritional Services has determined that the best way to strike a balance between the needs of all the inmates who are not fully accommodated by the general confinement menu, is to provide as many meatless

entrees as possible while still providing inmates who choose not to eat the main entree for different reasons with two alternatives in a seven-day cycle. (Culkin Decl. ¶ 29). The Office of Nutritional Services also considered the possibility of providing a second alternative meatless entree for those two days per week, but DOCS determined that it would not be administratively or financially feasible to do so. (Culkin Decl. ¶ 30). Serving three entrees during a particular meal would make the determination of how many alternative entrees would be required, as well as the preparation and service of those entrees, more time consuming, labor intensive, and expensive. (Culkin Decl. ¶ 31).

In support of her statement, Ms. Culkin states that serving lines are only equipped with five compartments for hot foods, and adding an entree would require additional serving equipment. (Culkin Decl. ¶ 32). The service of a second alternative would also require additional inmate cooks and servers, which would, in turn, require additional civilian and security staff to supervise the inmates.[11] (Culkin Decl. ¶ 33). Additionally, inmates in disciplinary housing or keeplock would have to be accommodated as well, and DOCS would have to implement a time-consuming and

---

[11] Defendants have also submitted the declaration of Robert C. Schattinger, the DOCS Director of Nutritional Services, and Ms. Culkin's superior. (Dkt. No. 190-1). Director Schattinger's declaration was submitted in response to plaintiffs' attempt to discredit Ms. Culkin's statements about the administrative burdens that would be imposed upon DOCS, if it were to attempt to provide a completely vegetarian menu. (Schattinger Decl.). His responsibilities as Director require him to visit kitchens and mess halls throughout the state. (Schattinger Decl. ¶ 2). Plaintiffs attempt to tell DOCS that they should simply use pans that are less wide to fit the additional required food, that additional servers would not be required, and that to Mr. Jova's knowledge, meat items cost more than fruits and vegetables. (See Schattinger Decl. ¶¶ 5-10, 15-16 citing Keesh Aff. ¶¶ 14, 16 (Dkt. No. 185-2 at pp.1-7) and Jova Aff. ¶ 9 (Dkt. No. 185-2 at pp.8-11). Plaintiffs' assertions are unsupported by personal knowledge.

labor-intensive procedure for those inmates to select the particular entree prior to each meal. (Culkin Decl. ¶ 34).

Ms. Culkin noted that these additional costs would be only for a completely **vegetarian** option that would involve only two additional meals per week, while providing what plaintiffs ask for, a completely **vegan** menu would pose a significantly greater financial and administrative burden on DOCS than simply providing a completely "vegetarian" menu. (Culkin Decl. ¶ 34 n.6).  This would involve identifying all vegan inmates, creating a separate vegan menu, purchasing and preparing entrees, side dishes, beverages, and desserts containing no animal products, together with devising a means to serve these individuals.[12] *Id.*

Ms. Culkin also states that, considering that only *two meals per week* have an alternative entree that contains meat, "an inmate who consumes just the meatless side dishes, together with dessert and a beverage would receive enough food to satisfy that inmate and would receive "a nutritionally adequate diet." (Culkin Decl. ¶ 36).  Ms. Culkin also points out that both the general confinement menu and the RAM offer foods that are on plaintiffs' religious diet, albeit, not necessarily served at the same time as required by plaintiffs. (Culkin Decl. ¶¶ 37-41).  Ms. Culkin counted 45 different items listed on plaintiff Keesh's menu (AC, Ex. 1). (Culkin Decl. ¶ 39).  Ms. Culkin states that 28 of those 45 items are either served by DOCS as an entree, side dish, or dessert or are ingredients contained in dishes offered by DOCS to its inmates.

---

[12] In addition, Mr. Keesh's problem with soybeans restricts defendants' possibilities even further.

18

(Culkin Decl. ¶ 40).  Additionally, most of the remaining foods on plaintiff Keesh's list have very similar counterparts on the DOCS menu. (Culkin Decl. ¶ 41).  Thus, if as the Second Circuit states, plaintiffs really had any degree of "flexibility" in their requested diet, they would be able to be accommodated by the existing RAM.

Ms. Culkin also pointed out that plaintiffs have been able to purchase additional foods from the Shawangunk commissary. (Culkin Decl. ¶ 42 & Ex. P).  Many of the foods that are not available in the mess hall are available through commissary purchases. (Culkin Decl. ¶¶ 43-44).  Plaintiffs have taken advantage of the ability to purchase additional items from the commissary.  Ms. Culkin has submitted the commissary records for 2005, and 2007 through 2010, illustrating the plaintiffs' purchases. (Culkin Decl. ¶¶ 45-46) (citing Exs. Q & R).  Ms. Culkin has also pointed out that both plaintiffs have taken advantage of the commissary purchase to buy items that are clearly not vegan. (Culkin Decl. ¶ 46 n.9).  These foods include "Chunky Monkey" ice cream; shrimp soup; roast beef; corned beef; cream cheese; and chicken to name only a few. *Id.* (citing Ex. R at pp.3-6; 8-9; 15, 17-19; 25; 27-33; 35; 42; 52;57-59; 61; 64; 76; 86-89; 105; 118; and 120).

The Culkin Declaration shows that DOCS did consider affording inmates a "completely" vegetarian diet, but decided against it, not only in order to accommodate, the needs of other inmates, but to avoid the administrative and financial burdens.  The Second Circuit states that plaintiffs might be willing to "compromise as a result of further accommodation by the Defendants." 582 F.3d at 417 n.3.  Although one of

19

plaintiff Keesh's statements could be read as an attempt to compromise,[13] the rest of

plaintiffs' papers make it quite clear that they are not interested in compromising.  In

fact, in their current papers, plaintiffs seem to argue that DOCS should serve everyone

the Keesh diet because it is less expensive and healthier. (Dkt. No. 191, ¶ 15).

> 15. Upon information and belief, it is not against any
> religious tenet for any of the DOCS prisoners to eat a vegan
> diet, therefore, if DOCS was to provide one structured vegan
> diet, it would be less burdensome for DOCS.

 Plaintiff Keesh also states that

> . . . it is imperative that the Court order defendants (and
> DOCS to provide Tulukeesh adherents with a Keesh diet and
> that responsible people be assigned to handle the food for
> this diet.  Because from my experience, DOCS put many
> inmates in charge of the food who are criminal minded and
> not mindful of others, causing them to cross contaminate the
> food, using utensils on vegetables, etc., that was [sic] used
> on animal products.

*Id.* ¶ 20.  Although plaintiffs argue that providing the Tulukeesh diet would not

require extra staff, clearly if the inmates selected to serve food are unacceptable to

plaintiff, it is unclear who DOCS would have performing those tasks.  It is quite clear

that plaintiff Keesh is not even willing to eat the vegetarian options because they are

---

[13] In paragraph 6 of plaintiff Keesh's declaration, he states that
> 6.  If DOCS sought to cut down any perceived burden in providing a
> vegan diet (what Culkin claims to be an additional meal) all DOCS
> have to do is eliminate the animal meal and provide an entirely
> vegetarian menu that everyone can eat, not just the animal eaters, which
> would be the logical thing to do.

It first appears as though plaintiffs would be satisfied if DOCS replaced the two meals per week
where the RAM alternative was meat with a vegetarian dish that "everyone" could eat.  However,
again, there seems to be a confusion regarding what is vegetarian, and plaintiffs' demand that the
meals be vegan.

made with "animal flesh" or "animal milk." (Dkt. No. 191, ¶ 12).  Apparently,

however, Mr. Keesh has no problem eating honey, which is not technically vegan.

(Dkt. No. 26, Ex. 1 at 2) (stating that honey is one of the foods required in the

Tulukeesh diet on Mondays and Wednesdays).

Plaintiff Keesh's argument actually weighs in favor of the defendants' position.

Plaintiff Keesh clearly implies that the current menu would have to be completely

revamped in order to accommodate plaintiffs because they cannot eat the vegetarian

options that DOCS currently provides because they are made with animal flesh or

cheese (or soybeans).[14]  In arguing that DOCS should respect his religion and accusing

defendants of all sorts of deception, Mr. Keesh seems to forget that there are other

inmates in DOCS who might not want to eat what plaintiff Keesh eats, regardless of

whether it is "better" for them or not.  Plaintiff Keesh appears to care only about his

religion or his needs, but forgets that DOCS must attempt to balance its

accommodation of plaintiffs' needs with the needs of the other 55,000 inmates in New

York State.  DOCS cannot be expected to remake its entire food service system for

plaintiffs Keesh and Jova.

Mr. Jova goes to great lengths to tell the court how detrimental meat is to one's

health, and he also advocates that DOCS should feed all DOCS inmates a vegetarian

or vegan diet. (Dkt. No. 192, ¶¶ 9-26).  This is clearly not what the Second Circuit

---

[14] Plaintiffs compare the alleged costs of "animal items" versus "non-animal" items and allege that the non-animal items cost less. (Dkt. No. 191, ¶¶ 16-17; Dkt. No. 192, ¶ 9).  Plaintiff Jova states that "[t]he cost savings of serving meatless diets, in institutions, go way beyond meal expenses." (Dkt. No. 192, ¶ 9).  Plaintiff Jova also states that there are environmental costs to serving meat-based diets. *Id.* ¶¶ 20-25.

intended with its remand.  This is not a debate over whether DOCS should replace its meals with completely vegan or vegetarian meals, but whether providing additional vegan or vegetarian meals to plaintiffs is the least restrictive alternative under RLUIPA.  Additionally, notwithstanding that there are foods in the commissary that comply with the Tulukeesh diet,[15] when Mr. Keesh and Mr. Jova purchase extra food from the commissary, they purchases things such as toaster pastries; duplex creme cookies; strawberry short cakes; jelly beans; lemon creme cookies; honey roasted peanuts; "Chunky Monkey," (a flavor of ice cream); or shrimp soup.[16]

On one day, Mr. Jova purchased Pepsi Cola; Grape Soda; mayonnaise; Baby Ruth candy bars; several bags of nacho chips; cheese nip crackers; ice cream; Tang; and a bag of mints. (Defs.' Ex. R at p.13).  On another day, he purchased three cans of Tuna in oil; several bags of nacho chips; iced oatmeal cookies; macaroni and cheese; and fruit punch drink mix. *Id.* at 15.  If plaintiff Jova is complaining about being over-weight, it is not necessarily the DOCS menu that is making him so.

This court finds that defendants have shown that their religious alternative entree is the least restrictive means of furthering their compelling administrative interests.  There is no less restrictive means because defendants have shown that it is financially and administratively impossible to offer a completely vegetarian or vegan meal, particularly considering the problem created by plaintiff's unwavering demand

---

[15] (Defs.' Ex. P, Commissary Buy Sheet).

[16] (*See e.g.* Defs.' Ex. Q at pp.3-4, 18 (Mr. Keesh); Defs.'s Ex. R at pp. 3-6, 8-9, 15, 17-19, 25 (Mr. Jova)).

for a completely vegan diet (without soybeans).  Therefore, plaintiffs' claims for both injunctive and monetary relief may be dismissed.

## V.   **PERSONAL INVOLVEMENT**

### A.   **Legal Standard**

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability.  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citation omitted); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).  It has been held that personal involvement is also a prerequisite for a valid RLUIPA claim. *See Pilgrim v. Artus*, 9:07-CV-1001, 2010 WL 3724883 at *14 (N.D.N.Y. March 18, 2010) (Report-Recommendation) (citing *inter alia Joseph v. Fischer*, 08 Civ. 2824, 2009 WL 3321011, at *18 (S.D.N.Y. Oct. 8, 2009); *Hamilton v. Smith*, 9:06-CV-805, 2009 WL 3199520, at *9 (N.D.N.Y. Sept. 30, 2009)).

In *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.  A supervisory official is personally involved if that official directly participated in the infraction.  *Id.*  The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong.  *Id.*  Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue.  *Id.*  Finally, a supervisory official may be personally involved if he or she were grossly

23

negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty*, 490 F.3d 143, 152–53 (2d Cir. 2007) (citing *Colon v. Coughlin*, 58 F.3d 865, 873) (2d Cir. 1995)), *rev'd on other grounds*, __ U.S. __, 129 S. Ct. 1937 (U.S. 2009).

## B.    Application

Because this court has found no RLUIPA violation, this discussion is not necessary to the court's recommendation, but has been included as an alternative basis for the dismissal of any claim for damages.  Defendants allege that none of them were personally involved in plaintiffs' dietary issue.  According to Ms. Culkin, absent an emergency, "the administration at each facility has no authority to deviate from the religious alternative menu without the prior approval of the Office of Nutritional Services. (Culkin Decl. ¶ 19).  If none of the defendants had the authority to change the existing menu or to provide a separate menu as plaintiffs requested, they could not be liable for damages, regardless of their position in the facility hierarchy.  A review of the existing defendants shows that none of them worked for the Office of Nutritional Services, and none of them would have the professional knowledge or the authority to determine whether plaintiffs' requested menu was nutritionally adequate to provide to plaintiffs or to any other inmate.[17]

---

[17] Defendant Pataki was the Governor of New York during the period in question.  Clearly the Governor would have no personal involvement in the food served in DOCS facilities.  Defendant Smith was the Superintendent of Shawangunk Correctional Facility and was not involved in determining what food to serve inmates.  Defendant Goord was the Commissioner of DOCS and was not involved in determining what food to serve inmates, nor is he alleged to have been involved with plaintiffs' dietary requests, other than as the recipient of various letters of complaint written by plaintiffs. (AC ¶¶ 18, 26, 29, 49, 52, 53, 58, 60, 61, 63, 83, 84, 127).  Defendants Wright, Bunce,

Because none of the defendants had the authority to change the menu policy or the menus themselves, none of the defendants were personally involved in any violation. *See Hamilton v. Smith*, 9:06-CV-805, 2009 WL 3199520, *9 (case dismissed against doctor who had no authority to change DOCS procedures for prescribing special inmate diets); *Hatzfield v. Goord*, No. 04-CV-159, 2007 WL 700961 at *3 (N.D.N.Y. Feb. 28, 2007) (dismissing for lack of personal involvement because the Superintendent did not create the policy nor was there any allegation that he had the power to create or terminate the policy). Therefore, the RLUIPA claim could be dismissed as against the individual defendants, in the alternative, based upon a lack of personal involvement.

## VI.   **QUALIFIED IMMUNITY**

### A.   **Legal Standard**

Qualified immunity protects government officials performing discretionary functions in the course of their employment where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A government actor is entitled to qualified immunity "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant

---

Cutler, Selsky and Ewanciw were only named in connection with plaintiff's retaliation claim, and thus, were not involved in their dietary requests. Deputy Superintendent Gorelick lacked the authority to deviate from DOCS dietary policy. Neither defendants Nuttal, the Deputy Commissioner for Program Services, nor Mark Leonard, the Director of Ministerial and Family Services worked for the Office of Nutritional Services and would not have had the authority to change the menus for plaintiffs.

to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001) (internal quotation marks omitted).

In determining whether qualified immunity applies, the court may first consider whether the facts alleged show that the defendants' conduct violated a constitutional or statutory right. *Saucier v. Katz*, 533 U.S. 194, 201(2001), *modified by Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 818 (2009) (holding that, "while the sequence set forth [in Saucier] is often appropriate, it should no longer be regarded as mandatory in all cases"). If the court finds that no constitutional or statutory right would have been violated if the allegations were established, there is no necessity for further inquiry concerning qualified immunity. *Saucier*, 533 U.S. at 201.

The defense of qualified immunity protects only individual defendants, not governmental entities and applies only to damage claims, not to claims for equitable relief. *Rodriguez v. City of New York*, 72 F.2d 1051, 1065 (2d Cir. 1995) (citing *Allen v. Coughlin*, 64 F.3d 77, 81 (2d Cir. 1995); *Giacalone v. Abrams*, 850 F.2d 79, 84 (2d Cir. 1988)). Finally, in determining the right at issue, the Supreme Court has expressly "cautioned against" framing the right too broadly, and in *Redd v. Wright*, the Second Circuit stated that it has "interposed a 'reasonable specificity' requirement" on the constitutional or statutory right for qualified immunity purposes. *Redd v. Wright*, 597 F.3d 532, 536 (2d Cir. 2010) (citing *Wilson v. Lane*, 526 U.S. 603, 615 (1999); *Dean v. Blumenthal*, 577 F.3d 60, 67-68 (2d Cir. 2009)).

## B.    Application

The Second Circuit dismissed the constitutional claims in this case, and because

this court has found that defendants did not violate RLUIPA, and were not responsible for the dietary policy in any event, the court need not address the issue of qualified immunity.  However, assuming that damages would have been available under RLUIPA against defendants in their "individual capacities,"[18] the court notes that defendants would have been entitled to assert qualified immunity as a defense to any individual damage claims.

Even assuming that a violation of  RLUIPA could be established, this court cannot find that reasonable corrections personnel in 2003 would have known such a right would be violated with respect to plaintiffs' dietary demands.  The court must keep in mind the letter and the demands that were sent to defendants Goord and Smith on October 14, 2003.  (Dkt. No. 26-1; AC Ex. 1 at 1-7).  At that time, plaintiff Keesh was demanding that, among other requirements, the Tulukeesh adherents were to be served certain foods on certain days, were to have "separate eating equipment," and were to "only [eat] food that [was] prepared by Keesh adherent(s)." *Id.* at 2.

The Keesh adherents were to eat "seven servings of fruit a day" unless it was a fast day, and were required to eat "***fresh navy beans***" at least four times per week. *Id.* The letter specifically stated that "we have fixed diets that are to be eaten on certain days which are listed in our Holy Book . . . ." *Id.*  Although the court notes that plaintiff Keesh's most recent submission in support of his "Motion to Vacate" that

---

[18] In *Hall v. Epke*, 2010 WL 3996211, *3 (2d Cir. Oct. 13, 2010), the Second Circuit reserved on the issue of whether damages would be available under RLUIPA against the state defendants in either their individual or official capacities, pending the Supreme Court's decision in *Sossamon v. Texas*, *supra*.

will be decided by Chief Judge Mordue, indicates that "the menu is not restricted to these exact foods", there is no such concession in the letter that the defendants received on October 14, 2003.[19]  *Compare* AC, Ex. 1 at 1-3 (referring to "fixed diets'), *with* Dkt. No. 194 at 9).[20]  The October 13, 2003 letter also stated that the plaintiffs should receive their meals "all at one time at about 12p.m. which can be consumed throughout the day as we choose."

Regardless of the existence of RLUIPA, this court is aware of no case that would have indicated to a reasonable corrections officials that offering plaintiffs the Religious Alternative menu instead of giving them the exact foods requested on their diet would have violated that statute.  Whether plaintiffs decided later that it was in their best interests to allege that they would have compromised,[21] that is not what was before defendants at the time that they made their decisions.  Thus, defendants would have been entitled to qualified immunity from any damage claim that would have been available under RLUIPA.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No.

---

[19] The court also notes that plaintiffs attempted to assert this willingness to "compromise" in their first motion to vacate. (Dkt. No.  130 at 12-13 -CM/ECF pages; pp.8-9 - plaintiffs' page numbering).

[20] Page 9 refers to the page assigned within Dkt. No. 194 by the CM/ECF system.  Plaintiffs have numbered this page 7 of their submission.

[21] As stated above, although plaintiffs continue to allege that they are willing to accept other foods, their papers make it clear that their idea of compromise is quite different than that envisioned by the Second Circuit's decision.

168) be **GRANTED**, and plaintiffs' RLUIPA claim, the only remaining claim, be

**DISMISSED IN ITS ENTIRETY**, and it is

RECOMMENDED, that plaintiffs' motion for summary judgment (Dkt. No.

167) be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have

fourteen days within which to file written objections to the foregoing report.  Such

objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO**

**THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE**

**REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v.*

*Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: February 2, 2011

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**